Jose Marvin MARTINES, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–10–00172–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

June 23, 2011.

Crespin Michael Linton, Houston, for Appellant.

Jeri Yenne, Crim. Dist. Atty., Trey D. Picard, Asst. Dist. Atty., Angleton, for State.

Panel consists of Justices KEYES, HIGLEY, and YATES.*

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Jose Marvin Martines, of the offenses of sexual assault of a child and indecency with a child and

---

* The Honorable Leslie Yates, retired Justice, Fourteenth Court of Appeals, sitting by as-signment. *See* TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 2005).

assessed punishment at eight years' confinement and ten years' confinement, respectively.[1] Pursuant to an extradition agreement with El Salvador, the trial court sentenced appellant solely on the sexual assault charge. In four issues, appellant contends that (1) the State failed to produce sufficient evidence that appellant committed sexual assault; (2) the trial court erroneously denied appellant's motion to suppress a tape recording of a conversation between a police officer and appellant on the ground that the tape recorder did not accurately record the conversation; (3) the trial court erroneously admitted evidence of extraneous offenses involving appellant and the complainant, his daughter, S.M.; and (4) the trial court erroneously denied appellant's motion for mistrial made after a reference to a polygraph examination during jury deliberations.

We affirm.

## Background

On June 11, 2004, S.M., who was fifteen years old, and who was attending summer school classes before starting her sophomore year of high school, and her friend Jessica decided to skip class. At some point during the day, one of S.M.'s friends called and told her that the school principal knew that she and Jessica had skipped school and was looking for them. S.M. eventually told her boyfriend, Brian Flores, her friend Emma, and Jessica that her father, appellant, had "touched [her] inappropriately." Jessica's mother called the police, who took S.M. to the Juvenile Detention Center. S.M. told Juvenile Detention Center and Children's Protective Services ("CPS") officials, as well as her aunt, who picked her up from CPS, that her father had touched her inappropriately.

Shortly after her initial outcry, S.M. had a forensic interview with Bonnie Martin, the director of the Brazoria County Alliance for Children. At trial, S.M. testified that she told Martin that she had run away from home and school because "[appellant] had touched [her] inappropriately and had tried to have sexual intercourse with [her,]" and she did not want to live with him anymore. S.M. told Martin that appellant had touched and kissed her breasts on the morning that she skipped school. S.M. stated that she also told Martin about an earlier incident that occurred when her family had gone to buy her mother a cell phone. On this occasion, appellant and S.M. returned to the house to pick up some necessary information, and, when they arrived, appellant carried her to an empty bedroom and "tried to have sexual intercourse with [her.]" She testified that appellant undressed her and "tried to put his private part in [her] private part." S.M. stated that she pushed appellant away because "it had hurt." Appellant attempted to have intercourse a second time, but S.M. dressed and walked out of the room. The prosecutor clarified that S.M. told Martin that "[appellant's] private part or his penis ... touched [S.M.'s] private part."

S.M. also testified, on direct examination, that she met with the prosecutor on three occasions, and on the third occasion, a week before the trial, she told the prosecutor that "everything [she] had said was a lie." S.M. stated that she had lied because she was afraid that she would get into trouble for skipping school, and, therefore, she did not want to go home. She further testified that she first informed her mother that appellant was touching her inappropriately on her breasts and buttocks when she was in seventh grade because

---

1. *See* TEX. PENAL CODE ANN. §§ 21.11(a)(1), 22.011(a)(2)(C) (Vernon Supp. 2010).

she was angry with appellant for hitting her with a belt after he discovered her talking on the phone to a boyfriend. She stated that she told her mother on this occasion in the hope that her mother would make appellant leave the house. She also stated that the attempted intercourse incident did not occur, and she told her mother that appellant had "touched [her] inappropriately" on that occasion because she was angry with appellant for refusing to buy her a cell phone. S.M. did not recant to her mother until several weeks before the trial. S.M. testified that, although she had described appellant's alleged conduct to several people, including CPS officials, family members, and friends, she only recanted to her mother, the prosecutor, and defense counsel.

At this point, the prosecutor informed the trial court that she intended to ask S.M. about four extraneous offenses involving appellant. These extraneous offenses included allegations that appellant had touched S.M.'s breasts beginning when she was twelve years old, attempted sexual intercourse with S.M., and digitally penetrated S.M. Defense counsel objected on the grounds that (1) he received notice of the State's intent to introduce these extraneous offenses only six days before the trial started and (2) the extraneous offense allegations "would be an entirely different crime [from the charged offense] because the child would be under the age of 14." Defense counsel did not move for a continuance on the basis of surprise. Defense counsel also did not object under Rule 403 or otherwise argue that the prejudicial effect of the extraneous offenses substantially outweighed their probative value. He did object "based on Rule 404." The trial court overruled defense counsel's objections.

Before the prosecutor questioned S.M. about the extraneous offenses, the trial court gave the following limiting instruction to the jury:

> Ladies and gentlemen, you're instructed that there may be testimony coming before you in this case in the next few minutes regarding the Defendant's having allegedly committed offenses or bad acts other than those alleged against him in the indictment in this case. You cannot consider the following testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offenses or bad acts. And then you may only consider the same for its bearing, if it has bearing, on the previous and subsequent relationship between the Defendant and the child, if any, alleged against him in the indictment in this case and for no other purpose.

S.M. testified that she informed Martin in her forensic interview that her father started touching her inappropriately when she was twelve. S.M. did not recall telling Martin that appellant had touched her "over her clothes" until the family moved in with S.M.'s grandmother when she was thirteen or fourteen. S.M. testified that she told Martin that appellant began touching her on her "breasts and [her] butt" after the family moved in with S.M.'s grandmother. She thought she told Martin that, at this point, appellant also began touching her under her clothes. S.M. did not recall telling Martin about a second instance of attempted intercourse or about instances of digital penetration. S.M. acknowledged that she may have told Martin that the digital penetration happened once, but she "[didn't] exactly remember what [she] told [Martin.]"

Brazoria County Sheriff's Department Investigator R. Rosser testified that he met with appellant at his house to discuss the allegations against him in June 2004. It is undisputed that, at the time appellant

spoke to Rosser, he was not in custody and he had not yet been charged. At the beginning of the conversation, Investigator Rosser read appellant his *Miranda* warnings, explained the allegations against him based on S.M.'s forensic interview, and asked appellant if he could tape their conversation. He testified that during the course of the conversation, appellant admitted to touching and kissing S.M.'s breasts "more than two times" and stated that the last time he had touched S.M. was on the day she skipped school. Appellant did not explicitly deny the attempted intercourse with S.M.; rather, he stated, "I don't recall that." Investigator Rosser testified that it was difficult to hear appellant on the tape because he was speaking "very lowly" and was "slumped over" in his chair during the conversation. Investigator Rosser opined that appellant "seemed sad" during the conversation. Approximately ten days after this conversation, appellant contacted Investigator Rosser and asked to speak with him a second time. Although appellant refused either to provide a written statement or to allow Rosser to record this conversation, he told Rosser, "I want you to know that everything [S.M.] had said was true."

Appellant moved to suppress the recording, contending that the tape recorder was not capable of making an accurate recording, that Investigator Rosser was not competent in operating the recorder, and that the recording was not accurate. At a pretrial hearing, Investigator Rosser testified that he recorded the conversation on a five or six-year-old Sony microcassette tape recorder. This tape recorder had a voice-activated recorder that would shut off if it did not detect any sound for a few seconds and would start recording again when it "reacts to something." Investigator Rosser agreed with defense counsel that the tape contained background "popping" noises that sounded like "the tape stopping and then continuing again." He further agreed that it was possible that, due to the "mechanical lag" of the voice-activated feature, the recorder might miss part of a word or a couple of words before it actually started recording.

The trial court stated its findings of fact and conclusions of law on the record at the suppression hearing. The trial court expressly found that:

> [A]lthough there are portions that are difficult to hear, there were no clear admissions anywhere in the tape that I heard concerning sexual intercourse by the Defendant, but there were a couple of admissions concerning touching the breasts.... The proponent, [Investigator] Rosser, testified sufficiently that the Sony microcassette recorder was ... what he claimed it to be, and the tape in the sections where there were the admissions concerning the touching the breasts appeared to be clear and unaltered, at least from listening to the context of the questions and answers.

The trial court concluded that the tape recorder was capable of making an accurate recording, that Investigator Rosser was competent in operating the recorder, and that the recording was accurate and did not appear to have been altered. The court denied appellant's motion to suppress.

Appellant's wife, Sandra Martines, testified that when S.M. was in seventh grade, S.M. told her that appellant was touching her inappropriately on her buttocks and breasts. Sandra confronted appellant, and he told her that he had been playing with S.M., and he asked Sandra to forgive him if he had touched S.M. inappropriately. Appellant cried, apologized, and stated that he "would not do that [anymore.]" Sandra testified that S.M. told her in March 2004 that appellant had touched her

inappropriately "like before." Sandra did not remember if she spoke to appellant after this second disclosure. She testified that she did not inform the authorities of S.M.'s allegations on either occasion. Sandra acknowledged that S.M. had recanted to her, and she testified that she did not tell anyone about S.M.'s recantation.

Brian Flores, S.M.'s boyfriend at the time of her outcry, testified that when he first saw S.M. on June 11, 2004, she was not upset about anything and seemed "normal." After S.M. learned that the principal knew that she and Jessica had skipped class and was going to call their parents, she was "terrified" and did not want to go home. Later that day, S.M. told Brian that she did not want to go home because "her father would sexually abuse her and harass her." Brian testified that S.M. did not feel comfortable telling him details and that she cried when she told him, but she did tell him that appellant would "feel on" her thighs and chest. He also stated that he had known that S.M. had "issues" with her father, but he did not know that these issues were sexual in nature.

Sharon Burns, a licensed sex offender treatment provider, testified that CPS referred appellant to her treatment program. According to Burns, appellant stated during his initial intake session that "he had offended his daughter." Burns testified that appellant expressed remorse for his actions "from the beginning" and told her that he "didn't realize the impact of his actions on his family and his daughter." During group sessions, appellant "appeared remorseful and saddened" and "expressed gratitude for the opportunity to get help in addressing the issues." Burns testified that appellant admitted "the offense against his daughter" during each of his group sessions from October 2004 to March 2005. Burns also testified that "pretrial" therapy participants would "rarely . . . admit something that's not true because of the legal nature and the limited confidentiality that's explained to them." Burns further stated that it is "not uncommon" for child sexual abuse victims to recant the allegations before testifying.

Cory Greenburg, a licensed counselor with CPS, testified that she met with both S.M. and appellant. S.M. did not go into "explicit detail" regarding the allegations, but "she did confirm that her father had sexually abused her." Greenburg worked with S.M.'s family for approximately eight months, and S.M. never recanted during this time period. Greenburg also testified that S.M. had "difficulties" after her outcry, including "flashbacks of the abuse," difficulty relating to boys her age, and fear of her father. Greenburg met with appellant during October 2004, and she testified that, "one of the first things he told me was that everything [S.M.] had said in her interview was true, and that he was not going to deny that he sexually abused her." During this meeting, appellant cried several times, expressed a "great deal of remorse for what he had done," and said that he had "made a big mistake."

Bonnie Martin testified that during her forensic interview, S.M. indicated that she had told several people of the allegations against appellant before she arrived at CPS: her friends Jessica, Emma, and Brian, Jessica's mother, who advised S.M. to call the police, the police when they arrived at Jessica's house, and her aunt on the phone. Martin agreed with Burns that recantation among child victims of sexual assault is not unusual. Martin testified that S.M. gave no indication during her interview that what she had disclosed was not true. The trial court admitted into evidence the DVD recording of Martin's forensic interview with S.M.

Appellant failed to appear for closing arguments, and the trial court granted the State's motion for bond forfeiture.

After retiring for deliberations, the jury informed the trial court that it wished to hear the tape recording of Investigator Rosser's conversation with appellant. The trial court had admitted two portions of the recording into evidence. The prosecutor began playing the recording for the jury, but she failed to press stop immediately at the end of the first section of admissible material. As a result, the jury heard Investigator Rosser ask appellant if he would take a polygraph examination. It is undisputed that the jury did not hear appellant's answer to this question and no polygraph results, if any, were mentioned to the jury. After the prosecutor belatedly stopped the recording, the trial court stated, "That's not admissible in evidence and y'all are to disregard that." The prosecutor then apologized and stated that she "looked at [the] numbers [on the tape player] wrong."

After the jury returned to deliberations, defense counsel moved for a mistrial and argued:

> Evidence of a polygraph is not admissible at any time, certainly not after closing arguments. So, I think in this case this is something that the jury cannot ignore. I mean, they've heard the word that it was offered to him. They have no idea if he took one and passed it, took one and failed it, or didn't take it at all. And in this case I think that the potential damage is so great that a mistrial has to be granted.

The trial court denied the motion for mistrial, reasoning that the prosecutor did not intentionally fail to stop the recording until after a polygraph was mentioned, that the court quickly addressed the issue, that the jurors appeared to understand that they could not consider any polygraph evidence, and that the jury did not hear whether appellant agreed to take a polygraph or whether he refused.

The jury convicted appellant of sexual assault of a child and indecency with a child and assessed punishment at eight years' confinement and ten years' confinement, respectively. The trial court delayed sentencing appellant until February 2010, when he was extradited from El Salvador. Pursuant to the extradition agreement, the trial court sentenced appellant only on the sexual assault charge.

## Sufficiency of the Evidence

In his first issue, appellant contends that the State failed to present sufficient evidence that he sexually assaulted S.M.

### A. Standard of Review

■ When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim.App.2010). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks,* 323 S.W.3d at 899; *Bartlett v. State,* 270 S.W.3d 147, 150 (Tex.Crim.App.2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App.2000), *overruled on other grounds, Laster v. State,* 275 S.W.3d 512 (Tex.Crim.App.2009). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We resolve any inconsistencies in

the evidence in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim. App.2000).

### B. Sexual Assault of a Child

To prove that appellant committed sexual assault of a child, the State was required to establish that appellant intentionally or knowingly caused the sexual organ of S.M., a child under the age of seventeen and who was not appellant's spouse, to contact appellant's sexual organ. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(C) (Vernon Supp. 2010).

■ A conviction for the offense of sexual assault of a child is "supportable on the uncorroborated testimony of the victim of the sexual offense...." TEX.CODE CRIM. PROC. ANN. art. 38.07(a) (Vernon 2005); *Lee v. State,* 176 S.W.3d 452, 458 (Tex.App.-Houston [1st Dist.] 2004) ("The testimony of a child victim alone is sufficient to support a conviction for indecency with a child."), *aff'd,* 206 S.W.3d 620 (Tex.Crim. App.2006); *Navarro v. State,* 241 S.W.3d 77, 81 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd) (holding same). The State has no burden to produce any corroborating or physical evidence. *Benton v. State,* 237 S.W.3d 400, 404 (Tex.App.-Waco 2007, pet. ref'd); *see also Lee,* 176 S.W.3d at 458 ("The lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence."). We liberally construe testimony given by a child victim of sexual assault, and as long as the child communicates to the fact finder that the touching occurred on a part of the body within the definition of the statute, the evidence will be sufficient. *See Lee,* 176 S.W.3d at 457.

Appellant contends that the evidence is insufficient to support the conviction because the State failed to establish that his sexual organ contacted S.M.'s sexual organ. S.M. testified that appellant never entered her and that she "pushed him away because it hurt." Appellant contends that "[i]t is highly doubtful that the hurt or pain came from the mere contact of his penis with her vagina," and, thus, he argues that the State failed to present evidence of contact.

Sexual assault by contact and sexual assault by penetration are distinct offenses under Penal Code section 22.011(a)(2). TEX. PENAL CODE ANN. § 22.011(a)(2)(A), (C); *see also Patterson v. State,* 152 S.W.3d 88, 92 (Tex.Crim.App.2004) (affirming court of appeals' decision upholding separate convictions for aggravated sexual assault by penetration and aggravated sexual assault by contact). Here, the indictment alleged that appellant intentionally or knowingly caused S.M.'s sexual organ to *contact* his sexual organ; the indictment did not allege that appellant caused the penetration of S.M.'s sexual organ. Thus, the State was not required to prove that appellant "entered" S.M.

S.M. testified that she told Martin in her forensic interview that, on one occasion, appellant took her into a room in their house and "tried to have sexual intercourse" with her. S.M. recalled that she told Martin that appellant undressed her and "tried to put his private part in [S.M.'s] private part." S.M. testified that she then told Martin that she pushed appellant away because "it had hurt." Appellant immediately attempted intercourse again, but S.M. dressed and left the room. The prosecutor then clarified:

[State]: [S.M.], when you talked to [Martin] and in describing today what you said, [appellant's] private part or his penis, is that what touched your private part?

[S.M.]: That's what I said.

[State]: Okay. And he didn't enter you, but he attempted to enter you; is that correct?

[S.M.]: Yes, that's what I had said.

The trial court admitted into evidence the DVD recording of S.M.'s forensic interview.

■ The testimony of the child victim alone is sufficient to support a conviction for sexual assault of a child. TEX.CODE CRIM. PROC. ANN. art. 38.07(a); *Lee*, 176 S.W.3d at 458. We conclude that S.M.'s testimony is sufficient evidence of genital-to-genital contact between appellant and S.M., and, thus, the State presented sufficient evidence that appellant caused S.M.'s sexual organ to contact his sexual organ, as required by the indictment.

Appellant also argues that the evidence is insufficient to support the conviction because S.M. recanted her initial outcry prior to trial and testified that she had lied because she was scared of getting in trouble for skipping school and because she was angry with appellant for being a strict disciplinarian.

■ A complainant's recantation of earlier outcry testimony does not destroy the probative value of that testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim.App.1991). At the trial in *Chambers*, the complainant recanted her earlier videotaped outcry statement in which she told the investigating officer that Chambers had been molesting her. *Id.* at 459–60. The Court of Criminal Appeals noted that the jury observed the complainant's demeanor while she testified and it was entitled to reconcile conflicts in her testimony and to disbelieve her recantation. *Id.* at 461; *see also Saldaña v. State*, 287 S.W.3d 43, 60 (Tex.App.-Corpus Christi 2008, pet. ref'd) ("[I]t is up to the fact finder to determine whether to believe the original statement or the recantation. A fact finder is fully entitled to disbelieve a witness's recantation."); *Jackson v. State*, 110 S.W.3d 626, 631 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd) ("[A] criminal conviction, which requires proof beyond a reasonable doubt, may rest on hearsay despite the lack of the complainant's testimony or even the complainant's recantation.").

On direct examination, S.M. acknowledged that, a week before the trial, she told the prosecutor that "everything [she] had said [regarding the allegations against appellant] was a lie." S.M. stated that appellant did not touch her breasts on the morning that she skipped school and that she lied because she was scared of going home and getting into trouble. Regarding the alleged attempted intercourse incident, she testified that she told her mother that appellant had touched her inappropriately because she was angry due to appellant's refusal to buy her a cell phone. She also stated that she only recanted to her mother, the prosecutor, and defense counsel, and she did not recant to anyone until a few weeks before trial.

Sandra Martines testified that S.M. first told her that appellant had touched her inappropriately on her buttocks and breasts when she was in the seventh grade. When Sandra confronted appellant, he cried, asked forgiveness, and said that he would not do it again. Sandra testified that she did not tell anyone about S.M.'s pre-trial recantation.

Brian Flores, S.M.'s boyfriend at the time of her outcry, testified that S.M. told him that she did not want to go home because "her father would sexually abuse her and harass her." He further testified that S.M. was reluctant to tell him any details and that she cried when she told him.

During the tape-recorded conversation with Investigator Rosser, appellant admitted to touching S.M.'s breasts "more than twice." Appellant "did not recall" whether he attempted intercourse with S.M. Later,

appellant contacted Investigator Rosser and asked to speak with him on a second occasion. During this conversation, appellant stated, "I want you to know that everything [S.M.] had said was true."

Similarly, Sharon Burns testified that appellant admitted that "he had offended his daughter" during both his initial intake session into the sex offender treatment program and during group counseling sessions. Burns described appellant's demeanor as remorseful, saddened, grateful for the opportunity to get help, and worried that he would not see his family again. Burns also testified that alleged offenders participating in pretrial therapy would "rarely ... admit something that is not true because of the legal nature and the limited confidentiality [of the group sessions] that's explained to them." Burns and Bonnie Martin, S.M.'s forensic interviewer, agreed that it was not uncommon for children to recant their initial allegations prior to trial.

Cory Greenburg testified that S.M. did not describe the contact in explicit detail, but "she did confirm that her father had sexually abused her." Greenburg worked with S.M.'s family for approximately eight months, and S.M. never denied that the abuse had occurred. Greenburg also met with appellant in October 2004 and testified that "one of the first things [appellant] told [Greenburg] was that everything [S.M.] had said in her interview was true, and that he was not going to deny that he sexually abused her." Greenburg stated that appellant cried during the meeting, expressed "a great deal of remorse for what he had done," and told her that he had "made a big mistake."

■ It is the role of the fact finder, who weighs the evidence and evaluates the credibility of the witnesses, to determine whether to believe a witness's outcry or recantation, and "[a] fact finder is fully

entitled to disbelieve a witness's recantation." *Saldaña*, 287 S.W.3d at 60; *see also Maldonado v. State,* 887 S.W.2d 508, 509 (Tex.App.-San Antonio 1994, no pet.) ("Just because the complaining witness recants incriminating testimony does not mean the evidence is insufficient."). In convicting appellant of sexual assault, the jury made a credibility determination to believe S.M.'s outcry testimony to Sandra, Brian, Greenburg, and Martin and appellant's admissions of guilt to Investigator Rosser, Burns, and Greenburg, instead of S.M.'s recantation. We afford almost complete deference to this determination. *See Lancon v. State,* 253 S.W.3d 699, 705 (Tex. Crim.App.2008); *Lee,* 176 S.W.3d at 458 ("A court of appeals must show deference to such a jury finding.").

■ Thus, viewing the evidence in the light most favorable to the verdict, we hold that the State presented sufficient evidence for a rational fact-finder to have found beyond a reasonable doubt that appellant sexually assaulted S.M.

We overrule appellant's first issue.

### Accuracy of Tape Recording

In his second issue, appellant contends that the trial court erroneously denied his motion to suppress the tape recording of his conversation with Investigator Rosser because the State did not establish that the tape was a "correct and accurate recording" of the conversation.

#### A. Standard of Review

We review the denial of a motion to suppress for an abuse of discretion. *Shepherd v. State,* 273 S.W.3d 681, 684 (Tex. Crim.App.2008) (citing *State v. Dixon,* 206 S.W.3d 587, 590 (Tex.Crim.App.2006)). When we review a trial court's denial of a motion to suppress, we give almost total deference to the trial court's express or implied determinations of historical facts

while reviewing de novo the court's application of the law to those facts. *Id.; Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000). We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State,* 214 S.W.3d 17, 24 (Tex.Crim.App.2007) (quoting *State v. Kelly,* 204 S.W.3d 808, 818 (Tex.Crim.App.2006)). The trial court is the "sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony." *St. George v. State,* 237 S.W.3d 720, 725 (Tex.Crim.App.2007). The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *Green v. State,* 934 S.W.2d 92, 98 (Tex.Crim.App.1996). We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App.2003).

### B. Admissibility of Tape Recording

Appellant contends that the trial court erred in admitting the tape recording because the State failed to show that the recording was authentic and correct, as required by the Court of Criminal Appeals' decision in *Edwards v. State,* 551 S.W.2d 731 (Tex.Crim.App.1977), and because Investigator Rosser's tape recorder was not capable of making an accurate recording, as required by Code of Criminal Procedure article 38.22, section 3(a)(3).

Article 38.22, section 3(a) sets forth the requirements for the admission of an oral statement of an accused "made as a result of custodial interrogation." TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (Vernon 2005); *see also Nguyen v. State,* 292 S.W.3d 671, 677–78 (Tex.Crim.App.2009) (discussing how the "custody" element of article 38.22 can be satisfied); *Herrera v. State,* 241 S.W.3d 520, 526 (Tex.Crim.App.2007) ("Article 38.22 of the Texas Code of Criminal Procedure governs the admissi-

bility of statements made by a defendant during custodial interrogation in a criminal proceeding."). Appellant concedes that he was not in custody at the time Investigator Rosser recorded their conversation. Thus, because it is undisputed that appellant's oral statements on the tape recording were not "made as a result of custodial interrogation," the State was not required to establish the five elements of article 38.22, section 3(a) as a predicate for the admission of the tape recording.

Appellant also relies on the seven-factor test for the admission of audiotape recordings adopted by the Court of Criminal Appeals in *Edwards* to support his contention that the recording at issue here was inadmissible because the State did not establish that it was authentic or correct. *See* 551 S.W.2d at 733. The Court of Criminal Appeals has recognized, however, that *Edwards* was superseded by the adoption of the Texas Rules of Criminal Evidence, and, thus, *Edwards* is "no longer needed as an authoritative guide for admissibility of 'electronic recordings' including 'sound recordings.' " *Stapleton v. State,* 868 S.W.2d 781, 786 (Tex.Crim.App. 1993); *see also Angleton v. State,* 971 S.W.2d 65, 69 (Tex.Crim.App.1998) ("[W]e find that attempting to cling to the *Edwards* test after the enactment of Rule 901 [of the Texas Rules of Evidence] will result in unwarranted confusion for practitioners, trial courts, and appellate courts. Rule 901 is straightforward, containing clear language and understandable illustrations."); *Porter v. State,* 969 S.W.2d 60, 66 (Tex.App.-Austin 1998, pet. ref'd) ("The precision that the seven prongs of the *Edwards* test suggest might be required in the introduction of such audio tape evidence is no longer applicable."). Thus, because the Texas Rules of Evidence have superseded *Edwards,* the State was not required to specifically establish any of

*Edwards*' seven prongs to obtain admission of the tape recording.

Instead, the State had to comply with Texas Rule of Evidence 901. *Jones v. State*, 80 S.W.3d 686, 688 (Tex.App.-Houston [1st Dist.] 2002, no pet.) ("Texas Rule of Evidence 901 governs the admissibility of electronic recordings."). Rule 901 provides that authentication is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX.R. EVID. 901(a); *Angleton*, 971 S.W.2d at 67 ("The State offered the audio tape as an accurate copy of a recording of a conversation between appellant and his brother Roger. The authentication requirements of Rule 901 would be satisfied by evidence sufficient to support a finding to that effect."). Rule 901(b) contains a nonexclusive list of methods for authenticating evidence, including testimony from a witness with knowledge "that a matter is what it is claimed to be." TEX.R. EVID. 901(b)(1); *Angleton*, 971 S.W.2d at 67. Appellant does not contend that the tape recording admitted into evidence is not a recording of his conversation with Investigator Rosser; rather, he challenges the accuracy of the recording based on the frequent "pops" caused by the particular tape recorder.

In *Maldonado v. State*, 998 S.W.2d 239 (Tex.Crim.App.1999), the Court of Criminal Appeals addressed whether two "skips" or "anomalies" in the audio recording of the defendant's statement made during custodial interrogation rendered the tape inadmissible under article 38.22 section 3. The *Maldonado* tape contained two "over-records," where the record button had been pressed and a total of four seconds had been recorded over the original contents of the tape. *Id.* at 244. In analyzing whether the recording was "accurate and [had] not been altered," the Court of Criminal Appeals noted that nei-

ther of the two "skips" occurred during the portion of the recording in which the defendant confessed to the charged crime. *Id.* at 245. The court framed the issue as a "question of witness credibility": (1) did the State intentionally use the over-records to disguise its editing of the tape, or (2) did the brief interruptions occur accidentally, obscuring nothing of value in the conversation. *Id.* The court found that, based on the testimony of a sound recording expert and the interrogating officer, "[t]here is adequate evidence here to support the latter conclusion that the anomalies were merely inadvertent and did not affect the overall reliability of the tape." *Id.* The court concluded that the evidence "supports the position that the tape was accurate and had not been impermissibly 'altered' in the sense contemplated by Article 38.22 § 3(a)(3)." *Id.; cf. Quinones v. State*, 592 S.W.2d 933, 944 (Tex.Crim.App. 1980) ("The *Edwards* requirements do not mean that any alteration in a tape renders the tape per se inadmissible. If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of the evidence, the recording can still be admitted.").

Here, Investigator Rosser testified at the suppression hearing regarding his conversation with appellant. Investigator Rosser testified that he used a five or six-year-old Sony microcassette recorder to record the conversation. He stated that he did not manually stop and re-start the tape recorder after he initially started recording. He identified the two voices heard on the recording as appellant's and his, and he testified that the tape offered into evidence was an accurate copy of the original and had not been altered in any way. On the recording, appellant admitted to touching S.M.'s breasts "more than two times." He did not admit to engaging

or attempting to engage in sexual intercourse with S.M.

On cross-examination, Investigator Rosser testified that the tape recorder had a voice-activated recorder, and he agreed with the following description of this feature:

> [Defense counsel]: [W]hat I'm calling a voice-activated recorder would be that you turn the machine on and if it doesn't hear anything for a few seconds, it shuts off so that it doesn't keep using up the tape.
>
> [Rosser]: Yes.
>
> [Defense counsel]: And then it will start up again when it reacts to something.
>
> [Rosser]: Yes.

Investigator Rosser also agreed that there were background noises on the tape, which sounded "like the tape stopping and continuing again" and that a "popping noise" would occur when the tape recorder "starts up again with the voice." He also agreed that it was possible that, due to this feature, the tape recorder might miss a part of a word or a couple of words before it actually started recording again after detecting a voice. Investigator Rosser admitted that a "popping sound" occurred just before he asked appellant if he admitted to touching S.M.'s breasts. On re-direct examination, Investigator Rosser reiterated that nothing had been edited or deleted from the tape.

The trial court entered its findings of fact and conclusions of law on the record. The court specifically found that:

> [A]lthough there are portions that are difficult to hear, there were no clear admissions anywhere in the tape that I heard concerning sexual intercourse by the Defendant, but there were a couple of admissions concerning touching the breasts. . . . The proponent, [Investigator] Rosser, testified sufficiently that the Sony micro-cassette recorder was . . . what he claimed it to be, and the tape in the sections where there were the admissions concerning the touching the breasts appeared to be clear and unaltered, at least from listening to the context of the questions and answers.

The court concluded that the tape recorder was capable of making an accurate recording, that Investigator Rosser was competent in making that recording, and that the recording was accurate and did not appear to have been altered.

A review of the tape recording reflects that the "popping" noises occurred throughout the recording. Occasionally, the "pops" obscured the beginning of the first word of a sentence, but it is still possible to understand Investigator Rosser's questions and appellant's answers. Popping sounds preceded Investigator Rosser's questions: "So you admit to touching [S.M.'s] breasts?" and "You touched her breasts at the house in Houston, and then you touched her breasts at [your current house]?" Appellant's responses—"I admit that . . . ." and "Correct," respectively—were clear, not obscured by any popping noises, and made logical sense in the context of the questions. *See Maldonado*, 998 S.W.2d at 244 ("In fact, the flow of the conversation and the background noise on the tape was consistent before and after the over-records."). There is no indication of any "over-records," any additions to the tape, or any other alterations.

■ Investigator Rosser's testimony and the tape itself support the conclusion that the "popping" noises caused by this particular tape recorder were inadvertent and did not obscure anything "of value in the dialogue." *See id.* at 245. We conclude that the record supports the trial court's finding that the tape recorder accurately recorded Investigator Rosser's

conversation with appellant and that the recording has not been impermissibly altered. We therefore hold that the trial court did not abuse its discretion in denying appellant's motion to suppress and admitting the tape recording.[2]

We overrule appellant's second issue.

### Admission of Extraneous Offense Evidence

Appellant next contends, in his third issue, that the trial court erroneously admitted evidence of extraneous offenses involving appellant and S.M. because the offenses were more prejudicial than probative, in violation of Rules 403 and 404, and because the State failed to provide reasonable notice that it intended to use the offenses.

### A. Unfair Prejudice

Appellant first contends that the prejudicial effect of the extraneous offense evidence outweighs the probative value because the extraneous offenses allegedly occurred when S.M. was under fourteen, which constitutes the more serious offense of aggravated sexual assault of a child.

Generally, evidence of extraneous offenses is not admissible at the guilt-innocence phase of a trial to prove that a defendant acted in conformity with his criminal nature and character by committing the charged offense. TEX.R. EVID. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App.1990); *Sanders v. State*, 255 S.W.3d 754, 758 (Tex.App.-Fort Worth 2008, pet. ref'd). The Code of Criminal Procedure, however, provides

that in a sexual assault case involving a complainant under seventeen years of age,

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:
>
> (1) the state of mind of the defendant and the child; and
>
> (2) the previous and subsequent relationship between the defendant and the child.

TEX.CODE CRIM. PROC. ANN. art. 38.37, § 2 (Vernon Supp. 2010). This statute, therefore, supersedes the application of Rule 404. *See Sanders*, 255 S.W.3d at 758; *Howland v. State*, 966 S.W.2d 98, 103 (Tex. App.-Houston [1st Dist.] 1998), *aff'd on other grounds*, 990 S.W.2d 274 (Tex.Crim. App.1999).

Evidence that is relevant under article 38.37 is "nevertheless subject to exclusion if its probative value is substantially outweighed by the danger of unfair prejudice...." *Sanders*, 255 S.W.3d at 760; *see* TEX.R. EVID. 403; *see also Walker v. State*, 4 S.W.3d 98, 103 (Tex.App.-Waco 1999, pet. ref'd); *Poole v. State*, 974 S.W.2d 892, 897 (Tex.App.-Austin 1998, pet. ref'd). Unfair prejudice "arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one." *Sanders*, 255 S.W.3d at 760 (citing *Montgomery*, 810 S.W.2d at 389). When a defendant objects to the admission of extraneous offense evidence based on Rule

---

**2.** Even if the trial court erroneously admitted the recording, we note that Investigator Rosser testified, without defense objection, regarding appellant's admissions during the conversation. "The admission of inadmissible evidence can be rendered harmless if the same or similar evidence is introduced with-

out objection elsewhere during trial." *Elder v. State*, 132 S.W.3d 20, 27 (Tex.App.-Fort Worth 2004, pet. ref'd); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex.Crim.App.2003) ("An error in the admission of evidence is cured when the same evidence comes in elsewhere without objection.").

403, the trial court "has a nondiscretionary obligation to weigh the probative value of the evidence against the unfair prejudice of its admission." *Id.; Walker*, 4 S.W.3d at 103 ("Upon a proper objection, the trial court is required to conduct a Rule 403 balancing test and determine the admissibility of the evidence."). If the trial court overrules the objection, we assume that the court conducted the balancing test and determined that the evidence was admissible. *Sanders*, 255 S.W.3d at 760; *Walker*, 4 S.W.3d at 103. The trial court need not perform this balancing test on the record. *Sanders*, 255 S.W.3d at 760; *Poole*, 974 S.W.2d at 897.

The trial court is required to conduct a Rule 403 balancing test only upon a proper objection by the defendant. *See Sanders*, 255 S.W.3d at 760 ("When a defendant makes a rule 403 objection...."); *Walker*, 4 S.W.3d at 103 ("Upon a proper objection ...."); *see also Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App.1997) ("Once a Rule 403 objection as to prejudice versus probative value is invoked, the trial judge has no discretion as to whether or not to engage in the balancing test required by that rule."). In an unpublished memorandum opinion, we previously held that the defendant failed to preserve his appellate contention that the prejudicial effect of relevant evidence under article 38.37 substantially outweighed the probative value because the defendant did not object in the trial court on Rule 403 grounds. *Joseph v. State*, No. 01–02–01109–CR, 2004 WL 637924, at *6 (Tex. App.-Houston [1st Dist.] Apr. 1, 2004, pet. ref'd) (mem. op., not designated for publication). In *Joseph*, defense counsel objected to the admission of extraneous offense evidence on the grounds that it was irrelevant and that the testimony "would serve to place [the defendant] on trial for the physical assault, i.e. 'in effect trying another case.'" *Id.* We concluded that neither

of these objections "invoked Rule 403 nor complained of any prejudicial value." *Id.* We held that once the trial court determined that the evidence was admissible under article 38.37, "it was incumbent upon [the defendant] to ask the trial court to exclude the evidence by its authority under Rule 403, on the ground that the probative value of the evidence ... is nevertheless substantially outweighed by the danger of unfair prejudice." *Id.* Because Joseph did not object under Rule 403, he failed to preserve that contention for appellate review. *Id.*

Here, the prosecutor informed the trial court that she wished to ask S.M. about four extraneous offenses involving appellant. Defense counsel first objected on the ground that he only received six days' notice of the State's intent to use the extraneous offenses. Defense counsel then made the following objection:

And we would object because the allegations that [the State] wants to go into now would be an entirely different crime because the child would be under the age of 14. And if any of the jurors have any knowledge of the law, which they probably have because of the amount of times that this subject has come up in the newspapers and the news media, then it may adversely affect their ability to be fair and impartial on the charges which have been alleged.

After discussion with the parties and a brief recess, during which the trial court drafted a limiting instruction to read to the jury before the State questioned S.M. about the extraneous offenses, defense counsel restated his notice objection. Defense counsel then made the following Rule 404 objection:

Also, although the language in the [limiting] instruction comes from the Code of Criminal Procedure, I believe 38.37,

which also specifically negates Rule 404 of the Rules of Evidence, we would object based on Rule 404. I see no reason why we should have a Rule 404 if it's not going to be, you know, paid attention to due to a statute.

Counsel did not object under Rule 403, nor did he argue that the prejudicial effect of the extraneous offenses substantially outweighed their probative value.[3] The trial court overruled all of defense counsel's objections.

■■■ We conclude that after the trial court determined that the extraneous offense evidence was admissible under article 38.37, it was appellant's responsibility to request that the trial court exclude the evidence under Rule 403 on the ground that the prejudicial effect of the evidence substantially outweighed the probative value. *See id.* Because appellant did not make a proper Rule 403 or unfair prejudice objection in the trial court, we hold that appellant has not preserved this contention for appellate review. *See also Pena v. State,* 285 S.W.3d 459, 464 (Tex. Crim.App.2009) ("To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.' ") (quoting *Lankston v. State,* 827 S.W.2d 907, 908–09 (Tex.Crim.App.1992)).

Even if appellant's objection that the extraneous offense evidence involved a more serious offense than the charged offense could be classified as a Rule 403 objection, we note that, when balancing probative value and prejudicial effect un-

der Rule 403, we give the trial court wide latitude in admitting extraneous offense evidence and we presume that "the probative value will outweigh any prejudicial effect." *Sanders,* 255 S.W.3d at 760 (citing *Montgomery,* 810 S.W.2d at 389). Therefore, the objecting party bears the burden "to demonstrate that the probative value is substantially outweighed by the danger of unfair prejudice." *Id.* (citing *Hinojosa v. State,* 995 S.W.2d 955, 958 (Tex.App.-Houston [14th Dist.] 1999, no pet.)).

Appellant's prejudice argument on appeal consists of the following:

> [T]he extraneous offenses allegedly happened when [appellant's] daughter was less than 14 years of age which makes these offenses the more serious felony of Aggravated Sexual Assault of a Child. Allowing testimony concerning a more serious crime of Aggravated Sexual Assault of a Child is more prejudicial than probative for Appellant. The prejudicial effect of [S.M.'s] testimony outweighs its probative value concerning these offenses which allegedly happened in 2003 and 2004.

Appellant cites no authority for the proposition that a "more serious" extraneous offense automatically requires a conclusion that the prejudicial effect of the offense substantially outweighs its probative value. Appellant also fails to consider the Court of Criminal Appeals' conclusion that, in prosecutions for sex offenses against children, "extraneous acts between the complainant and the defendant are usually more probative than prejudicial." *See Boutwell v. State,* 719 S.W.2d 164, 178 (Tex.Crim.App.1985); *Poole,* 974 S.W.2d at 898.

---

**3.** In his brief, appellant states that defense counsel "objected that [the extraneous offenses'] prejudicial effect would outweigh their probative value under Rule 404 of the Texas Rules of Evidence." Although defense counsel made a Rule 404 objection, he never mentioned the prejudicial effect of the offenses substantially outweighing their probative value.

We conclude that appellant has not met his burden of establishing that the prejudicial effect of the extraneous offenses substantially outweighs the offenses' probative value.

### B. Failure to Provide Reasonable Notice

Appellant also contends, in his third issue, that the trial court erroneously admitted the extraneous offense evidence because the State only gave six days' notice of its intent to use the extraneous offenses. The State contends that appellant failed to preserve this complaint for appellate review because although defense counsel objected to the timeliness of the notice, he did not request a continuance. We agree with the State.

■ To preserve error regarding the State's failure to provide reasonable notice of its intent to use extraneous offense evidence, the defendant must request a continuance to mitigate the effects of surprise. *See Martin v. State,* 176 S.W.3d 887, 900 (Tex.App.-Fort Worth 2005, no pet.); *Koffel v. State,* 710 S.W.2d 796, 802 (Tex.App.-Fort Worth 1986, pet. ref'd) (citing *Lindley v. State,* 635 S.W.2d 541, 544 (Tex. Crim.App.1982)) ("[The defendant's] failure to request a continuance when he became aware of the [extraneous offense] evidence waived any error urged in an appeal on the basis of surprise.").

Here, the record reflects that after the State informed the trial court of its intent to offer extraneous offense testimony through S.M., defense counsel twice objected on the grounds that he only received six days notice of the State's intent and that this notice was not reasonable under Rule 404(b). Defense counsel did not, at any point, move for a continuance to allow additional time to investigate the allegations or prepare a defense. We therefore conclude that appellant failed to preserve for appellate review his conten-

tion that the State did not provide reasonable notice of the extraneous offenses. *See Martin,* 176 S.W.3d at 900 ("Having failed to [move for a continuance], Martin has waived any complaint that he was surprised by the State's [allegedly untimely] notice."); *see also McDonald v. State,* 179 S.W.3d 571, 578 (Tex.Crim.App.2005) ("Furthermore, had there been legitimate surprise that required a re-evaluation of trial strategy, the appellant could have requested a continuance.").

However, assuming, without deciding, both that appellant preserved error regarding the reasonableness of the State's notice and that the trial court erroneously overruled appellant's objection regarding timeliness of the notice, we would still overrule this sub-part of appellant's third issue because appellant has failed to demonstrate harm. Appellant argues on appeal that "[s]ix days['] notice was far too short of period of time for Appellant to prepare a proper defense" and that this error was not harmless "because a jury would have reached a different verdict had the evidence of a more serious crime committed against his daughter been excluded."

■ The admission of extraneous offense evidence without proper notice is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). Tex.R.App. P. 44.2(b). We disregard any error that does not affect appellant's substantial rights. *Id.; McDonald,* 179 S.W.3d at 578. We will not reverse a conviction when, after examining the record as a whole, we have a fair assurance that the error did not influence the jury or had but a slight effect. *McDonald,* 179 S.W.3d at 578 (citing *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim. App.1998)). "[W]e look only at the harm that may have been caused by the lack of

notice and the effect the lack of notice had on the appellant's ability to mount an adequate defense." *Id.* (citing *Hernandez v. State,* 176 S.W.3d 821, 824 (Tex.Crim.App. 2005)).

Appellant had the opportunity to cross-examine S.M., the source of the extraneous offense testimony. Appellant's defensive strategy primarily consisted of relying upon S.M.'s pre-trial recantation and her trial testimony that she was angry with appellant over his strict discipline and that appellant never touched her inappropriately. S.M. provided a motivation for lying about each instance of alleged abuse. Appellant does not argue that his defensive strategy would have changed had the State provided more than six days' notice of the extraneous offenses, and given S.M.'s complete recantation of the charged allegations, her explanation that she made her first outcry to her mother because she was angry at appellant, and her testimony that she "did not recall" telling Bonnie Martin about the most serious extraneous offenses in her forensic interview, "[i]t is hard to imagine that [appellant's] defense would have been altered in any meaningful way" had he received greater notice of the State's intent to use the extraneous offenses. *Id.*

■ Because appellant has not demonstrated that the State's failure to give reasonable notice of the extraneous offenses would have affected his trial strategy, "we conclude that the error did not influence the jury or had but slight effect." *Id.* at 578–79; *Hernandez,* 176 S.W.3d at 826 ("[A]ppellant has failed to make any showing of how his defense strategy might have been different had the State explicitly notified him that it intended to offer the complete tape recording at trial, or how his defense was 'injuriously' affected by the State's failure to provide reasonable notice.").

We overrule appellant's third issue.

## Denial of Motion for Mistrial

Finally, in his fourth issue, appellant contends that the trial court erroneously denied his motion for mistrial made during jury deliberations after the State, in response to a jury request to hear the tape recording of Investigator Rosser's conversation with appellant, played a portion of the tape in which Rosser asked appellant if he would take a polygraph examination.

■ A mistrial is required only when the impropriety is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999). We review the trial court's refusal to grant a mistrial for an abuse of discretion. *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex.Crim.App.2004) (citing *Simpson v. State,* 119 S.W.3d 262, 272 (Tex.Crim.App.2003)).

■ Due to their inherent unreliability and tendency to be unduly persuasive, the existence and results of polygraph examinations are inadmissible for any purpose in a criminal proceeding on proper objection. *Tennard v. State,* 802 S.W.2d 678, 683 (Tex.Crim.App.1990); *Jasso v. State,* 112 S.W.3d 805, 813 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd). The mere mention of a polygraph examination does not, however, automatically constitute reversible error, even if the results of the exam are revealed. *Tennard,* 802 S.W.2d at 683–84; *Jasso,* 112 S.W.3d at 813. When a polygraph is mentioned at trial and defense counsel requests a mistrial, we must first determine whether the results were revealed to the jury. *Jasso,* 112 S.W.3d at 814 (citing *Tennard,* 802

S.W.2d at 683). Generally, when polygraph results are mentioned but not revealed to the jury, an instruction to disregard is sufficient to cure any error. *Id.* In determining whether the trial court erroneously refused to grant a mistrial, we may also consider (1) whether the questioning party exhibited bad faith by asking a question designed to elicit polygraph evidence; and (2) whether polygraph evidence bolstered the State's case. *See id.* (citing *Buckley v. State,* 46 S.W.3d 333, 337 (Tex.App.-Texarkana 2001, pet. dism'd)).

 We have previously noted that "[n]umerous cases have held that where a witness gives a nonresponsive answer that mentions a polygraph test was offered or taken, but does not mention the results of such a test, there is no error in failing to grant a mistrial." *Kugler v. State,* 902 S.W.2d 594, 595 (Tex.App.-Houston [1st Dist.] 1995, pet. ref'd); *Barker v. State,* 740 S.W.2d 579, 582–83 (Tex.App.-Houston [1st Dist.] 1987, no pet.) (finding no error when witness mentioned that officers had asked defendant if he wanted to take a polygraph); *see also Garcia v. State,* 907 S.W.2d 635, 639 (Tex.App.-Corpus Christi 1995) ("Here, there was no testimony that appellant actually took a polygraph test, nor was it inferred that he refused to take one. Further, no results of the test were revealed to the jury."), *aff'd,* 981 S.W.2d 683 (Tex.Crim.App.1998).

Here, unlike most of the case law involving the introduction of polygraph evidence, no witness testified that appellant was offered the opportunity to take a polygraph. Instead, after the jury had retired for deliberations, the jury asked to hear the tape recording of Investigator Rosser's conversation with appellant. The State and defense counsel had previously agreed on which portions of the tape were admissible, and the prosecutor noted on the record the "counters" on the tape player that marked the parameters of admissible material. The prosecutor began playing the tape, but she failed to stop the tape until after Investigator Rosser asked appellant if he wished to take a polygraph examination. The prosecutor and the trial court had the following exchange:

[State]: I'm sorry.

The Court: Okay. That's not admissible in evidence and y'all are to disregard that.

[State]: Judge, that's my fault. I looked at my numbers wrong.

The prosecutor then played the remaining admissible portions of the tape for the jury. After the jury returned to deliberating, defense counsel moved for a mistrial and argued:

Evidence of a polygraph is not admissible at any time, certainly not after closing arguments. So, I think in this case this is something that the jury cannot ignore. I mean, they've heard the word that it was offered to him. They have no idea if he took one and passed it, took one and failed it, or didn't take it at all. And in this case I think that the potential damage is so great that a mistrial has to be granted.

The trial court explicitly stated its belief that the prosecutor did not intentionally play the inadmissible portion of the tape. The court also stated that it quickly addressed the problem, that the jury "appeared to understand that [the polygraph evidence] couldn't be considered," and that the jury heard no indication of whether appellant agreed or refused to take a polygraph. The trial court denied the motion for mistrial.

Although the prosecutor knew the specific portions of the tape recording that contained inadmissible material, there is no indication in the record that the prosecutor deliberately and intentionally failed to stop the recording until after Investigator Rosser had asked appellant to take a

polygraph. Instead, the only evidence is that the prosecutor "looked at [the counters on the tape player] wrong," and, thus, her failure to stop the tape at the proper moment was merely inadvertent.[4] Although the jury heard Investigator Rosser offer a polygraph examination to appellant, there was no indication that appellant refused to take the examination, nor was there any evidence that appellant actually took a polygraph. No polygraph results were revealed to the jury. Furthermore, the trial court promptly informed the jury that polygraph evidence was inadmissible and briefly instructed the jury to disregard. The trial court did not belabor the issue or call undue attention to the polygraph reference.

■ We conclude that the trial court's instruction to the jury to disregard Investigator Rosser's question to appellant sufficiently cured any error arising from the reference to a polygraph examination. We therefore hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. *See Garcia,* 907 S.W.2d at 639 (finding no error in denying mistrial when there was no testimony that defendant took polygraph or refused to take polygraph and no results were revealed to jury); *Kugler,* 902 S.W.2d at 595 (noting cases finding no error in denying mistrial when jury was informed polygraph was offered to defendant but results were not revealed).

We overrule appellant's fourth issue.

### Conclusion

We affirm the judgment of the trial court.

---

4. The record also reflects that defense counsel, in moving for a mistrial, did not intend to suggest that the prosecutor intentionally played the portion of the recording that contained Investigator Rosser's polygraph question.