# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00748-CR
## NO. 03-13-00749-CR

**Joseph Edward Johnson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NOS. 14,461 & 14,835
### HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In two cases consolidated for trial, a jury convicted Joseph Edward Johnson of the offenses of sexual assault of a child and indecency with a child.[1] Punishment was assessed at 15 years' imprisonment for each offense, with the sentences to run concurrently. In a single issue, Johnson asserts that the evidence is legally insufficient to support his convictions. We will affirm the judgments of conviction.

## BACKGROUND

Johnson was charged with sexual assault of a child and indecency with a child. The alleged victim was his girlfriend's daughter, B.T., who was fourteen years old at the time of the alleged offenses. Evidence considered by the jury, which we discuss in more detail below as

---

[1] *See* Tex. Penal Code §§ 22.011(a)(2), 21.11(a)(1).

it becomes relevant to Johnson's point of error, included the testimony of B.T., who was seventeen years old at the time of trial; Dr. William Lee Carter, a psychologist specializing in sexual abuse; Randy Hensley, a detective with the Elgin Police Department who investigated the alleged offenses; Tami Holland, a sexual assault nurse examiner (SANE) who examined B.T.; and Chase Baumgartner, a forensic scientist in the DNA section of the Texas Department of Public Safety (DPS) who tested articles of clothing belonging to B.T. and DNA samples provided by Johnson. Additionally, a video recording of an interview with Johnson conducted by Hensley and a CPS investigator was admitted into evidence. After hearing the evidence, the jury found Johnson guilty as charged. The district court assessed punishment as indicated above. This appeal followed.

**ANALYSIS**

In his sole point of error, Johnson asserts that the evidence is insufficient to sustain his convictions. Specifically, he claims that the State's evidence, including the testimony of the victim, is not credible in light of other evidence in the record.

When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.[2] We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted.[3] We assume that the jury resolved conflicts in the testimony, weighed the evidence, and

---

[2] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[3] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

drew reasonable inferences in a manner that supports the verdict, and we defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony.[4]

B.T. testified that in January 2011, she was living in a house with Johnson, as well as her mother, brother, and maternal grandparents. B.T. recounted that on January 31, 2011 she had suffered a "little low grade fever" and had gone to sleep in the bed in the garage where her mother and Johnson slept because it was warmer than in the house. She recalled that she "w[o]ke up to [Johnson] touching [her] and he smelt like alcohol and cigarettes and he was touching [her] chest and touching [her] in [her] genitals." B.T. testified specifically that Johnson touched her breasts with his hands and mouth both on top of and beneath her clothing,[5] that he then "started to lick [her] vagina with his tongue," and that his "tongue and fingers" touched the inside of her vagina.[6] She recalled that Johnson's fingernails were "long" and "kind of hurt [and] scratched." Additionally, she testified that Johnson took her hand and placed it on his penis. When B.T.'s mother returned home from work, B.T. recounted, Johnson pulled up B.T.'s pants and left the room. B.T. also left the room and called a friend to tell him what had happened. She and that friend then contacted the Elgin Police Department.

---

[4] *Jackson*, 443 U.S. at 318-19; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

[5] The articles of clothing that B.T. was wearing that evening were admitted into evidence.

[6] When first asked whether Johnson touched the inside of her vagina, B.T. answered, "I don't remember." However, after further examination, she specifically testified several times that he had done so.

3

On cross-examination, B.T. admitted that she had suffered auditory hallucinations in the past, specifically, voices telling her to do things. However, she also insisted that she has not experienced visual hallucinations, nor hallucinated scenarios that did not in fact occur.

Dr. Carter testified concerning hypothetical scenarios and the dynamics of child sexual abuse generally. In understanding a victim who claims to have auditory hallucinations, Carter noted that one must "take into account that" the victim may be "psychologically disturbed," but also recognize that the source of her distress may be the trauma caused by sexual abuse. He also explained that it is not uncommon for teenage sexual abuse victims to express that they hear voices, but such behavior does not indicate that the youths cannot discern between "right and wrong" or "truth and fiction."

Officer Hensley testified that he arranged for B.T. to be interviewed by a forensic examiner. Hensley observed the interview and obtained the articles of clothing that B.T. was wearing when the alleged offenses had occurred. As part of his investigation, Hensley provided that clothing, as well as an evidence kit obtained from the SANE nurse responsible for conducting the sexual abuse examination on B.T. and DNA samples provided by Johnson, to DPS for further analysis and DNA testing. He also detailed a voluntary, two-and-a-half-hour interview he conducted with Johnson at the Elgin Police Department on March 4, 2011. Hensley explained that Johnson first spoke with Hope Adams, a CPS investigator, then with Hensley, and that the entire interview was recorded. DVDs containing the video recordings were admitted into evidence. On cross-examination, Hensley acknowledged that he was unaware that B.T. had experienced hallucinations and conceded that if he knew an alleged victim had hallucinations it could change the way he thought about the case.

4

Holland, the SANE nurse, testified that B.T. informed her that Johnson "had touched her breast, put his mouth on her sexual organs, put his fingers inside of her sexual organs, touched her bottom" and "tried to get her to do a hand job on him."[7] Holland explained that she did not find any injuries to B.T.'s sexual organ during her examination. However, she further explained that when a female is menstruating, her sexual organ becomes "more fluffy and supple and soft," making it more likely to "heal[] very quickly." Accordingly, she testified, the lack of scratches or other visible injuries was consistent with B.T.'s report during the examination that she was about to begin her next menstrual cycle. In fact, she noted that "most of the times [the] exams are normal because of the fact that the body heals so quickly in that area." On cross-examination, Holland testified that B.T. did not inform her that she experienced hallucinations. She also conceded that her examination could be consistent both with an assault or "with nothing at all."

Chase Baumgartner, the DPS forensic scientist, testified about the process of DNA testing as well as the specific results of his analysis. He explained that the first step in his process includes a visual examination of the evidence using an alternative light source akin to a "black light" to locate stains. He further explained that certain bodily fluids including semen and saliva will fluoresce under the light. Baumgartner testified that during his visual examination of articles of clothing obtained from B.T. he discovered a stain on the "left upper chest or breast area" of her tank top. He explained that further testing ruled out semen as a potential cause of the stain, but saliva remained as a possible source. He then conducted "nuclear short tandem repeat DNA analysis" on

---

[7] Johnson objected to this testimony as hearsay. The district court admitted the testimony as a statement made "for purposes of medical diagnosis or treatment." *See* Tex. R. Evid. 803(4). Johnson has not challenged this ruling on appeal.

the stain, which revealed that the DNA located on the sample was consistent with both B.T. and Johnson. Specifically, Baumgartner concluded that Johnson could not be excluded from fourteen of sixteen of the markers contained in the profile he obtained from his analysis. He explained that the probability of selecting an unrelated African-American person (as Johnson is) at random who could be a contributor of the profile is approximately 1 in 944.3 million. On cross-examination, however, Baumgartner acknowledged that he had located no DNA evidence on B.T.'s other clothing and that it was possible that individuals who lived in the same house for several years could share DNA on articles of clothing.

No witnesses testified for the defense. During his video-recorded interview, Johnson claimed that the allegations were "all a setup" orchestrated to get him to move out of the house. He also repeatedly emphasized that he had taken sleeping pills before the incident, which had made him extremely drowsy. Initially, he emphatically denied any improper conduct, but later he responded "I don't know," and "I hope nothing happened," when asked again if he had committed the alleged acts.

Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that the evidence is sufficient to support Johnson's convictions. The victim, B.T., provided detailed testimony describing what Johnson had done to her. B.T.'s testimony was corroborated by Holland, the SANE nurse, who testified that B.T. had identified Johnson as the person who committed the offenses against her and described those offenses in a manner consistent with her trial testimony. Similarly, Baumgartner testified that he observed a stain on the "left upper chest or breast area" of B.T.'s tank top that could have been caused by saliva, which would have been consistent with B.T.'s testimony that Johnson had touched her breasts

with his mouth both on top of, and beneath, her clothing. Further, testing revealed that the stain contained DNA consistent with Johnson's DNA sample, with astronomical odds against such a fact occurring at random.

In his brief, Johnson argues that the jury could not have rationally relied on B.T.'s testimony regarding the alleged offenses given that (1) she initially responded "I don't remember" when asked whether Johnson had touched the inside of her vagina and (2) that she testified that she had experienced auditory hallucinations.[8] These defensive theories were argued at trial, and the jury apparently rejected them, as was its prerogative as the trier of fact. Based on all of the evidence in the record, summarized above, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Johnson had committed the offenses of sexual assault of a child and indecency with a child as charged.[9]

We overrule Johnson's sole point of error.

---

[8] Although Johnson emphasizes B.T.'s "questionable mental health status" should have caused "any thoughtful juror" to take her testimony with a "very large grain of salt," we note that B.T. testified that, despite any mental health issues she might have, she had managed to maintain a full-time job while simultaneously completing her senior year of high school and participating in various activities including rugby and choir.

[9] *See, e.g.*, *Martines v. State*, 371 S.W.3d 232, 239-42 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Shaw v. State*, 329 S.W.3d 645, 657-58 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Couchman v. State*, 3 S.W.3d 155, 162-64 (Tex. App.—Fort Worth 1999, pet. ref'd); *see also Perez v. State*, No. 05-08-01125-CR, 2009 WL 5193932, at *6 (Tex. App.—Dallas Dec. 17, 2009, pet. ref'd) (mem. op., not designated for publication) (in sufficiency challenge to conviction for sexual assault of child and indecency with child, jury was sole judge of credibility and weight to give testimony of child victim that had various diagnosed mental illnesses).

**CONCLUSION**

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   July 31, 2014

Do Not Publish