Opinion issued August 12, 2021



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-19-00547-CV

—————————————

## NOE SANTANA, JR., Appellant

## V.

## MARCELA ORTIZ, Appellee

On Appeal from the 309th District Court
Harris County, Texas
Trial Court Case No. 2017-30600

## MEMORANDUM OPINION

This is an appeal from the trial court's judgment in a suit affecting the parent-child relationship ("SAPCR"). After a two-week jury trial, the jury awarded sole managing conservatorship of six-year-old S.A.S. to her mother, Marcela Ortiz. Her father, Noe Santana, Jr., appeals. In four issues, he argues that the trial court abused

its discretion in excluding witnesses, that the trial court abused its discretion in admitting testimony related to a polygraph test, and that the trial court erred in calculating child support and awarding attorney's fees. We affirm.

## Background

Santana and Ortiz had two daughters, Aliza Rebecca ("Becky") and S.A.S. In April 2017, Santana filed a petition for conservatorship of S.A.S.[1] In the petition, he alleged that Ortiz engaged in a pattern of child abuse and neglect, and he sought to be appointed sole managing conservator. Santana received temporary conservatorship of S.A.S., and Ortiz was granted supervised visitation. In 2019, after a two-week jury trial, the jury granted sole managing conservatorship of S.A.S. to Ortiz.

At the start of the trial, the court ruled that because Santana had failed to disclose other witnesses in discovery, he would be allowed to call only two witnesses: Ortiz and himself. Ortiz called several witnesses.

### A. Trial Testimony

#### 1. Noe Santana, Jr.

Santana testified that prior to filing his petition in 2017, both daughters resided with Ortiz. Ortiz did not work, and Santana paid for his daughters' living expenses.

---

[1] Becky was not the subject of this SAPCR and was over eighteen by the time of trial.

Santana paid the mortgage and upkeep for the house they lived in with Ortiz, and he also paid for a vehicle, health insurance, car insurance, groceries, and vacations.

Santana testified that he started dating Ortiz when she was 22 years old, and he was 39 years old. At the time, both Santana and Ortiz were married to other people. When Ortiz was 24 years old, they had their first child, Becky. Santana testified that Becky lived with her mother until she was four years old. Becky then lived with Santana for about the next eight years until SAS was born in 2012. For the following five years, Becky and SAS lived with their mother. In 2017, after a hearing on Santana's petition, both daughters went to live with him. Since Becky was now over 18 years old, Santana expected that she would choose to continue living with him for the foreseeable future.

Santana testified that he is a funeral director and has been in the funeral business since 1989. He runs three funeral home locations, and one of the locations has a crematory. He receives additional income from contracts related to dealing with the deceased. For example, after Hurricane Ike, he acquired a contract with the federal government to search for and recover people that were missing. He has done similar work in Louisiana at an oil refinery. He also had a 20-year contract with Harris County to transport dead bodies. When a person died, he would go to the site, remove the body and transport it to the medical examiner's office. He also stated that he had other ongoing business ventures in addition to his funeral home business.

3

Santana testified that he cared for his daughters' physical appearance. Both daughters have long hair, reaching down to the back of their legs. He learned how to do elaborate braided hairstyles for them, and he testified that he continues to brush Becky's hair though she is 18 years old.

Regarding activities, Santana testified that Becky was involved in high school activities, such as volleyball, and that he attended almost all of her games, but Ortiz did not. Santana testified that Ortiz attended one game because it was in San Antonio, and she liked to have margaritas there. Santana testified that he has never consumed alcohol.

Santana testified that religious upbringing is important to him. Both daughters attended a large church with him. On one occasion, S.A.S. prayed before a crowd of 25,000 people. Santana encouraged S.A.S. to be involved in church by reminding her to her pray and sing for police officers, firefighters, or other people in uniform if she sees them while running errands. At Christmas, she went to several police stations and jails and stood outside to praying for them. When they were driving in the car, if S.A.S. saw a police officer, she prayed for their protection. Santana testified that he wants her to respect law enforcement and understand that law enforcement sacrifices to protect her. At the time of trial, Becky attended church or church-related activities four nights a week. She also volunteered in a crisis pregnancy center. Santana testified that Ortiz has not encouraged the same religious

upbringing. Santana also expressed concern over Ortiz's brother-in-law, whom he believed is a sex offender. Santana did not want S.A.S. around him.

The court took a short recess after Santana's direct examination. On cross-examination after the recess, Santana stated that he went down the hall in the courthouse during the break to check on Becky. He walked up to her, gave her a hug, and kissed her on the lips. He did not agree with Ortiz's counsel when asked if he had kissed his daughter as though she were his spouse.

Ortiz's counsel asked about his then-current wife, Norma, and childcare for S.A.S. Santana testified that he has been estranged from Norma since 1998. They live in separate houses. At the time of trial, no other people besides Becky and S.A.S. lived with Santana. He testified that while he is at work, S.A.S. is at school, and when she is done with school for the day, either he or Becky picks her up.

When questioned, Santana testified that he does not list his home address on his driver's license. Instead, his driver's license lists his address as an office building that he has owned since 1972. He explained that he receives mail at the office building address and that there have been multiple attempts on his life and attempted kidnappings of his family members, so he lists an office address to protect himself.

Ortiz's counsel asked Santana about his daughters' exposure to the funeral business. Santana admitted that on more than one occasion he has taken both daughters to the crematory and allowed them to watch while it was in use. He

admitted that he exposed them to "burning a human body." S.A.S. first visited the crematory at age four, and at the time of trial, she had been to the crematory, watching while it was in use, three or four times. On one occasion, he discovered that S.A.S. had been bitten by an insect while at the crematory and took her to the hospital. S.A.S. required antibiotics for an extended period of time to treat the bite.

Ortiz's counsel questioned Santana about his persistent communication with Ortiz. Santana claimed he began his relationship with Ortiz in 1998, when he was 39 years old, and she was 22 years old. He wrote her several love letters in a notebook that they passed back and forth. Ortiz's counsel showed Santana the notebook, which was admitted into evidence. Santana read from the notebook, including pages where he wrote his nickname for Ortiz, "Mares," more than 20 times in a row. He read from several letters where he repeatedly told Ortiz that he loved her, wondered what she was doing at various moments of the day, and expressed that he had feelings of "distrust and uncertainty" regarding their relationship. Santana verified that multiple small notebooks contained his letters from early in his relationship with Ortiz, and the notebooks were admitted into evidence.

He testified that in the beginning of their relationship, Ortiz broke up with him on several occasions. On one occasion, he had a confrontation with Ortiz's mother at her house. Santana read from a letter he wrote to Ortiz about the encounter, including that he would not allow her mother to intimidate or scare him. He

continued to profess his love for Ortiz. He also wrote letters explaining that he was struggling not being with her, that he wanted to take her to a "nice place" and to a movie, but that she refused to go out with him.

There were periods of time during their relationship that Ortiz was employed. Santana admitted that when Ortiz had a job, he called her at work multiple times a day. He also went to her workplace, sat next to her, and wrote her letters. The letters profess his love for Ortiz, ask what she is thinking or doing, and request that she spend more time with him and pay him more attention. He read from an excerpt where he wrote her a new letter every thirty minutes, wondering what she was doing without him, though she was sitting next to him at her place of employment.

On many occasions, Santana asked Ortiz to send him photographs of herself. He testified to an example of how he would ask for photographs of specific body parts. On another occasion, Santana sent Ortiz a video of himself masturbating and ejaculating onto her photo. At the time, Becky lived with Santana and used his phone. Ortiz was concerned that Becky had access to the videos and photographs on Santana's phone.

Santana took photos of ashes and bones from the retort, a machine that cremates bodies, and sent them to Ortiz. He testified that he took the photograph "to share it with someone I was in a relationship [with] at that moment." On one occasion, Santana texted a photo to Ortiz of a body during the cremation process

7

depicting mostly ashes with an intact skull and teeth. Another time, Santana sent Ortiz a video of a body being cremated. He also sent her a video of S.A.S. running around the retort at the crematory when S.A.S. was four years old. He admitted that he had explained in great detail and showed both Becky and S.A.S. the process of cremating a body. He did so because he believed it was important for his daughters to understand how his work supported them like "take your daughter to work day." He did not think that it would be emotionally traumatic for a four-year-old to observe a human body being incinerated. Santana testified that on more than one occasion he had taken Becky with him for a "cleanup," where he went to the location where a person died to supervise the cleanup of the body and the area. Santana also testified that on multiple occasions, Ortiz sent him emails and text messages demanding that he leave her alone and stay out of her life.

Ortiz's counsel questioned Santana about the events that led to Becky and S.A.S. living with him in April 2017. Santana testified that in April 2017, Becky called him at 3:00 p.m. and told him that her mother had beaten her. When Becky called Santana, she was alone in her mother's house. Santana called 911 to report a "beating in progress" and police responded to Ortiz's house. Though Santana testified that when he found out about the altercation, Becky was alone in the house, he read from the police report with information from his 911 call that suggested Santana reported that Becky was with her mother. In the report, he stated that Becky

and Ortiz were having "an aggressive argument" and that he could not tell if they were being physical with one another. Santana testified that he had also called authorities at least three or four times alleging that Ortiz was trying to have him killed.

Ortiz's counsel introduced approximately nine photos of S.A.S. in which S.A.S. is between the age of two and four and not properly restrained in a car. Santana testified that he either took the photos or was "in the vicinity" of the car when they were taken. In some of the photos, S.A.S. is not wearing a seat belt, in others she is in a car seat but not buckled with a five-point harness, and in others she is in the front seat using a regular seat belt. Several of the photos suggest that the car was moving.

### 2. Sonya Lynch, Visitation Supervisor

Sonya Lynch testified that she was the supervisor of court-ordered visitation between Ortiz and her children for two hours twice a month between May 2018 and February 2019. Lynch described S.A.S.'s demeanor as very social, happy, and ready to begin visits. She testified that Becky continued to attend the visits even after she turned 18 in September 2018. Lynch noticed a change in Becky during the course of the visits that caused her concern. She became more withdrawn. According to Lynch, Becky acted as a "pseudo mom" to S.A.S. At times, Becky was "standoffish" with Ortiz. Lynch observed Becky telling Ortiz that she had graduated early from

high school. She had celebrated without inviting her mother. Lynch testified that Santana was often late bringing S.A.S. to a visit. He also asked Lynch to prohibit Ortiz from taking photographs of the children. Lynch informed him that Ortiz was allowed to do so.

Lynch testified that in July 2018, she observed the children hugging and kissing Santana when he dropped them off to visit with Ortiz. The kiss between Santana and Becky made Lynch uncomfortable because it did not seem like a kiss between father and daughter. She testified that she had to look away because the kiss was slower than a simple peck, and the two pressed their lips together. Lynch testified that Santana did not kiss S.A.S. the same way that he kissed Becky, and in all the years she had been a supervisor, she had not observed fathers kissing daughters in the same way.

In September 2018, Santana told Lynch in front of the children that he believed Ortiz had hired a hitman to kill him. Lynch stopped the conversation because it was inappropriate in front of Becky and S.A.S. Lynch also testified that her observation of S.A.S. and her mother led her to believe that Santana was attempting to alienate S.A.S. from Ortiz.

### 3. Ortiz's Goddaughter

A.B. testified that she was Ortiz's 17-year-old goddaughter. She spent every weekend, several holidays, and summers with Ortiz, and she had lived with Ortiz

10

full-time in 2016. She testified that every weekend she visited Ortiz, Santana was also at the house. Santana always had a loaded gun in the back of his pants. Santana made her uncomfortable because he was "too friendly." He offered her money and offered to pick her up from school or her house at any hour of the day. Often when he drove her home, he made her uncomfortable by placing his hand on her thigh. She remembered that he did so while driving her home at 11 years old. She did not tell anybody because she had seen him touch Becky in the same way, so she thought it was normal.

A.B. testified that Santana often took her and Becky to restaurants in the middle of the night. If they did not want to go, he called them ungrateful. When she was 11 or 12 years old, A.B. went with Santana and Becky to the crematory in the early hours of the morning. When they arrived at the crematory, Santana showed her how he blended bones, packaged ashes, and put bodies in and out of the crematory. Eventually, A.B. told her mother about Santana's behavior toward her. A.B. sought therapy through the Children's Assessment Center.

### 4. Oralia Guerra, Ortiz's eldest daughter

Oralia "Arlene" Guerra testified that she is Ortiz's eldest daughter. Santana is not her father. She testified that her first memory of Santana was when she was a toddler, in approximately 1998. Her memories of Santana included that his relationship with her mother was never stable, and he always argued with her mother.

11

She remembered that he always carried a gun in his waistband. She testified that at one point he was in charge of taking Becky and her to school. She felt uncomfortable because he made her sit in the front seat and hold his hand. After he dropped off Becky, he often tried to convince her to skip school and go eat lunch with him. He made her uncomfortable when he tried to get her to kiss him and when he put his hand on her thighs and shoulders. She first remembers that he tried to kiss her when she was 8 or 10 on a family camping trip. From age 12 to 17, she kept a pair of sweatpants with her at all times in case she was around Santana. She did not want to be wearing shorts near him because he would make comments on the tightness and length of her shorts.

Guerra described her interaction with Santana's funeral business. When Guerra was younger, Santana took them on family vacations. She stated that they would "move bodies all around Texas," meaning the family would go on a road trip to pick up a body and bring it back to Houston. The family rode in a large SUV or minivan, and the body would be in the back with the family as they drove, which made her feel scared. On other occasions, Guerra took her to school with a body in the back of the car on a stretcher, covered in a sheet. Sometimes he drove her to school in a hearse. Guerra testified that Santana took her to the crematory approximately 8 to10 times beginning at age 14. Sometimes he took her alone and

12

sometimes he took her with Becky. He showed Guerra where he cremated bodies and where bodies were prepared in the funeral home.

Guerra observed Santana physically abuse her mother and threaten her. He told her mother that he would take her to a field and shoot her, and because he was in the funeral business, nobody would be able to find her body. She testified that Santana controlled her mother. If her mother and Santana got in an argument, she and her mother would not have enough money to eat, or their electricity or cell phones would stop working. She also testified that her mother lost jobs because Santana would call her constantly or come to her workplace.

She testified that Santana and Becky constantly made allegations against her mother. A few weeks before trial, Becky alleged that Ortiz followed her down the street with a gun. Guerra testified that she was with her mother that day, and Becky was not with them. Guerra had never observed her mother be abusive to Becky or S.A.S. She also testified that she had never seen her mother be drunk in the way that Santana alleged.

Guerra testified that she had not seen Becky or S.A.S. in a year because Santana requested that she not attend the supervised visits. Guerra had seen Becky on many occasions at the courthouse during the pendency of the case. She observed that Becky and Santana were inseparable and that they were always hugging and

13

kissing each other. She did not think that they had a normal relationship, and she was afraid for Becky and S.A.S.

Regarding Santana's concerns about a family member who is a registered sex offender, Guerra testified that her maternal aunt's husband is a registered sex offender. Her aunt married him within the year before trial, but they had been together for 14 years. Guerra was never alone with him, and they did not have a relationship. He had never been inappropriate toward her. Finally, Guerra testified that both she and her mother sought therapy based on their experiences with Santana.

### 5. Ortiz's neighbor

Ortiz's neighbor lived directly across the street from Ortiz for 18 years. She also knew Santana because they went to high school together. She met Ortiz through Santana. Over the years, she observed Santana coming and going from Ortiz's house at odd hours. She observed that the electricity and utilities would be shut off frequently. When this happened, Ortiz told her that it was because Santana was refusing to pay a bill. The neighbor testified that Ortiz had two or three jobs between the time Becky was born and the time S.A.S. was born, but she was unable to keep the jobs because Santana would go to her workplace. On multiple occasions, the neighbor observed Santana carrying a gun around the house while children were present. According to the neighbor, Ortiz was always stressed and worried that she would be ridiculed by Santana. After S.A.S. was born, Santana did not come to the

14

house as frequently. Ortiz told the neighbor that she believed Santana was seeing someone else.

The neighbor was with Ortiz in 2017 when S.A.S. went to live with Santana. She described that Ortiz tried to make the transition as easy as possible, but S.A.S. was crying and did not want to go. Santana did not have a car seat for S.A.S. so Ortiz gave him hers.

The neighbor had observed Becky and Santana and believed that the way they kissed on the lips was concerning. She also observed them in the courthouse and thought that the way they hold hands is similar to the way a husband and wife hold hands, not how a father and daughter hold hands. According to the neighbor, Becky seemed very withdrawn and sad. The neighbor had observed a strong bond between S.A.S. and her mother, and she believed that Ortiz was a great mother.

### 6. Maria Carmen Cavazos, Ortiz's sister

Ortiz's younger sister, Maria Carmen Cavazos, testified that she first met Santana in 1987 when she was 8 years old, and Ortiz was 11 years old. Their grandmother lived across the street from Santana and his wife. Cavazos and Ortiz frequently visited their grandmother's house, and Santana often stopped by to mingle with the family, especially Ortiz. Ortiz told her that Santana would give her gifts, such as concert tickets, money, and jewelry.

Santana often followed Ortiz as she walked to the store for her grandmother. Ortiz told Cavazos that Santana would pick her up, take her to the store, grope her, and give her gifts. This went on for a period of two years before a family member confronted Santana. At that point, Santana distanced himself. Then, in 1993, Santana began spending time with the family again because he helped them with a death in the family. Santana started calling Ortiz again, but because Ortiz was married, Santana's attention shifted to thirteen-year-old Cavazos. He began calling her parents' home after midnight to talk. He offered her food and money. He stopped by her parents' home with bodies in the back of his car. Beginning in 1995, he sent numerous cards, books, and sweaters to Cavazos. Sometimes he went with her to the park and pushed her on a swing. While pushing, he pinched her bottom. She felt it was inappropriate and would run back to the car. Cavazos read a card to the jury that Santana sent her in 1995. He sent her the card with some books. The books were "love books." Cavazos described the books as "books for couples, how they would talk about love, and how the feelings for couples would be with each other."

Cavazos testified regarding her interaction with Santana and the funeral business. Santana gave Cavazos "trinkets" from deceased people. For example, he brought her food while he had a young man's body in his car, and he gave Cavazos the man's driver's license. On another occasion, he took Cavazos and Ortiz to the funeral home and took them to the back where a Hispanic woman's body was being

16

prepared. He groped the body's breast and commented that the breasts were full. On other occasions, Santana commented on whether the deceased had "real or fake" breasts after he felt them.

Cavazos testified that Santana always carried a gun, and she always felt threatened by him. Cavazos did not tell her parents because she was scared. Eventually, when she was 18, she told Ortiz. When confronted, Santana told Ortiz that Cavazos was lying because she was jealous of Ortiz.

She never reported Santana's behavior to law enforcement because he had threatened her so many times. Cavazos testified that Santana had many friends who were police officers, including an Officer Verbitzki. Santana wanted fifteen-year-old Cavazos to be with the officer. He told Cavazos that the officer would give her money, jewelry, and gifts in exchange. Cavazos testified that the same officer was present in the hallway during trial. Cavazos recounted that Santana had threatened to commit suicide on countless occasions. She did not know whether the threats were real or attention seeking.

Santana isolated Ortiz from her family. Though they lived minutes away, the family only saw Ortiz twice a year. Cavazos testified that after S.A.S. was born, Santana became "more persistent" with Ortiz. He would not allow Ortiz to the leave the house, even to go to the grocery store. Cavazos recounted three jobs that Ortiz lost because Santana did not let her work. He would go to her job, accuse her of

17

dating her coworkers, and call her office constantly. Cavazos testified that on many occasions, Santana would become angry with Ortiz and then take Becky to his house. Ortiz told Cavazos that Santana threatened to dismember and burn her body if she disobeyed him. When their grandmother died, Santana helped with the funeral. Ortiz told her sister that Santana forced her to have anal sex with him in return for the favor.

Cavazos testified that between 2015 and 2017, the relationship between Becky and Ortiz changed. Becky became physically aggressive with Ortiz. On one occasion, sixteen-year-old Becky bit her mother on the breast. She also punched her mother in the stomach. Cavazos testified that as Becky got older, the way she kissed her father was similar to the way Cavazos kisses her husband. She described it as "unnatural and "stomach turning." Cavazos testified that for the two years before trial, Santana had prevented Becky from seeing her family. Cavazos was concerned that if S.A.S. stayed with Santana, she would become like Becky.

Cavazos testified that Ortiz did not have the means to hire an attorney when the case started. She understood that the case started when Becky alleged that her mother assaulted her on April 17, 2017. It was Cavazos's understanding that Becky made the story up. She testified that Becky and Santana have made so many false allegations against Ortiz that Ortiz never leaves her house alone.

18

Cavazos testified that she began dating her husband in 2005, and at that time he was a registered sex offender. She became aware of his status when they started dating and did not have a problem with it. She testified that S.A.S. was only around her husband when she was with him, if at all.

### 7. Marcela Ortiz

Ortiz testified that she met Santana in the summer of 1987 when she was 11 or 12 years old. Santana lived across the street from her grandparents, and Ortiz spent time at her grandparents' house for family gatherings, holidays, weekends, and summers. During the first summer after she met Santana, Ortiz's grandparents often sent her to the corner store. While Ortiz walked down the street to the store, Santana followed alongside in his car, pressuring her to get in. At the time, he drove a convertible Mercedes. Santana would entice her with money and gifts, and he complimented her beauty. When he persuaded her to get in the car, he would drive past the corner store and take her to a store farther away.

Once school started, Santana offered to drive Ortiz to school, and he would show up after school waiting to drive her home. Soon, she began refusing rides from Santana because he started touching her inappropriately and exposing himself. He would brush his shoulder against her breasts and put his hands between her legs while they were driving. Santana also performed oral sex on Ortiz in the back of his car, though she refused to do the same to him. Ortiz walked to and from school along

a different route to avoid him. When she distanced herself, Santana became angry. Ortiz later learned that around the same time, her uncle confronted Santana about his inappropriate relationship with her. After the confrontation, Santana left her alone for a few years.

Ortiz testified that she married in 1991 at 15 years old because she wanted someone to protect her from Santana's advances. When she got married, she did not see Santana as frequently. In 1993, a family member died, and Santana helped the family with the funeral arrangements. Santana attempted to rekindle a relationship with Ortiz, promising the relationship could be different. Santana pursued a friendship with Ortiz for several years. He began by writing her numerous letters and calling her often. By 1997, when she was 21 years old, Ortiz was having an affair with Santana, who was 37 years old. Ortiz and her husband were struggling financially, and Santana promised her a house, family, children, and stability. He had a reputation as a powerful man within the community. Ortiz separated from her husband, and Santana rented her an apartment to live in with her daughter, Guerra.

Eventually, Santana wanted to have a child with Ortiz to bond them together forever, and Becky was born in September 2000. When Ortiz divorced, she received a house as part of the settlement, and she moved back into that house with Becky and her older daughter. Santana left some clothes in the house, but he never stayed

for an extended period of time. He would stay with them for a night and then go back to his wife.

Over time, Ortiz lost touch with her family and friends. She stopped going out with friends because Santana became enraged when she did. He insinuated that she was looking to date someone else and criticized the way that she dressed. When she asked him for money to support the children, he demanded sexual favors in return. Ortiz read from text messages, admitted as exhibits, demonstrating some of the hundreds of occasions that Santana demanded sexual favors in return for providing items for the children. On other occasions, he sent vulgar text messages that stated that if she sent him a photo of her body, he would give her a $1,000 Wal-Mart gift card.

Santana regularly demanded that Ortiz have sex with him at least 8 or 10 times a week. If she refused, he did not provide financially for the children. Sometimes he demanded that they have sex in the common areas of the house while the children were present or in bed while the children were in the same bed. If Ortiz refused to have sex, Santana sent her photos of dead bodies and cremations. He threatened that she or her children would end up dead and that he had ways of disposing a body that would prevent anyone from finding her. Hundreds of times, Santana threatened that he could cremate her. Ortiz offered photos into evidence of Santana after he had defecated on himself. She testified that on numerous occasions, he sent her similar

photos from the crematory and demanded that she bring him a change of clothes. When she arrived with the change of clothes, he raped her.

Ortiz testified that during her relationship with Santana she was not allowed to cut her hair. She requested permission to cut her hair, and he told her that women should have long hair and long red fingernails. When they had sex, Santana used Ortiz's ponytail "as leverage." Ortiz testified that she was not allowed to cut Becky or S.A.S.'s hair and that each had hair that reached the back of their legs.

Santana demanded that Ortiz share all of her bank account information with him. He refinanced her house and demanded that she sign the documents. He told her that it would be best for her. Though she owed about $30,000 on the house after her divorce, he refinanced it for $80,000 and kept the money for himself. Ortiz testified that Santana regularly carried a loaded gun, and when she told him that she did not think it was safe, he told her that she was crazy.

Over the years, Ortiz chose to seek employment, despite the fact that Santana did not want her to work. She felt like she was losing herself, and she did not want to have to ask Santana for money for anything that she needed for herself or her daughter. Santana told her that she would not be able to provide for herself like he provided for her. She worked at the Harris County courthouse in pretrial services for four years. Santana did not like that she worked at the courthouse, because he thought she was doing so to meet other men. His accusations that she was cheating

on him increased dramatically. While she was working, Ortiz did not have to ask Santana for money, and this angered Santana because he wanted her to be fully dependent on him. Often, he would come to the courthouse and watch her work. Other times he would call her multiple times a day on the work number. Ultimately, Ortiz was fired because she was not able to perform her job due to Santana's interruptions.

Ortiz then worked as a human resources assistant for two years. Santana's behavior followed the same pattern. He texted her multiple times a day demanding that she send him a photo of herself. If she did not immediately comply, he accused her of going out with someone else. Ortiz read text messages from Santana from 2013 showing that he demanded multiple sexual photos or videos throughout the day while she was at work, at night when she was home, and the next morning when she woke up and was trying to take the children to school. Ortiz was fired from the human resources job due to Santana's constant interruptions. When she was not working, often her utilities and phone would stop working because Santana refused to pay the bills.

Ortiz testified that Santana would offer a reduced funeral cost to those who could not afford it, if a woman would have sex with him. She knew of at least three different people who had sex with Santana in exchange for burial services. Ortiz also

testified that Santana would charge families airfare to fly a corpse back to the Houston area, but then he would drive the body himself.

When Becky was 4 or 5 years old, she began spending more time with Santana. Santana enrolled her in a daycare and kept her on weekends. As she spent more time with Santana, Becky became less affectionate with Ortiz. When Ortiz confronted Santana about her concerns for Becky, Santana told her that she was crazy and jealous of Becky. Becky lived with Ortiz and S.A.S. after S.A.S. was born.

When Becky was 16 or 17, she began spending a lot of time with Santana again. She became physically abusive toward Ortiz. Becky fought with her mother because she wanted to take S.A.S. to go visit her father. Both Santana and Becky continuously badgered Ortiz, wanting to take S.A.S. to live with them. Ortiz wanted S.A.S. to have stability and told them they could see S.A.S. at Ortiz's house. Ortiz was concerned because Santana did not transport S.A.S. in a car seat. She had hundreds of conversations with him about it. Ortiz also became concerned when Santana sent her videos of S.A.S. sitting in the front seat of the car. The way S.A.S. was sitting reminded Ortiz of how she sat in the front seat with Santana. Ortiz testified that Santana started taking S.A.S. to the crematory around age 3. Sometimes she received insect bites while there, and Santana told Ortiz not to worry about it.

## 8. L. Verbitzki

On rebuttal, Officer L. Verbitzki testified that between 1993 and 1995, he did not go with Santana to pick up Cavazos from school and that he did not attempt to have a relationship with her.

## B. Jury Verdict and Trial Court Disposition

After the witnesses testified, and outside the presence of the jury, Santana made an offer of proof listing all of the witnesses that had been excluded and summarizing the testimony they would have offered. The jury returned a verdict naming Ortiz as sole managing conservator of S.A.S. and decided that Ortiz should have the exclusive right to designate S.A.S.'s primary residence. While the jury was not present, Ortiz's attorney testified regarding her attorney's fees and Santana's counsel cross-examined her. The court awarded Ortiz's attorney $83,015.87 in fees and $2,455.62 in costs. The court found that the costs were incurred on behalf of the child. Following the jury's verdict, the court entered an order for possession, support, and access to S.A.S. Santana appealed.

## Exclusion of Witnesses

In his first issue, Santana argues the trial court erred in denying his request to call witnesses who did not appear on his discovery disclosure. Santana contends that the trial court abused its discretion by failing to apply a fairness test before excluding

his witnesses. He states that the witnesses were significant and preventing their testimony "probably did lead to a verdict against" him.

## A. Standard of Review and Applicable Law

During discovery, a party may obtain discovery of the name, address, and telephone number of any person who is expected to be called to testify at trial. *See* TEX. R. CIV. P. 192.3(d); *Dyer v. Cotton*, 333 S.W.3d 703, 717 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Parties have a duty to amend or supplement incomplete or incorrect responses to written discovery. *See* TEX. R. CIV. P. 193.5(a); *Dyer*, 333 S.W.3d at 717. If a party fails to timely make, amend, or supplement a discovery response, that party may not offer the testimony of a witness who was not timely identified unless the trial court finds that (1) good cause exists for the failure to timely make, amend, or supplement the response, or (2) the failure will not unfairly surprise or prejudice the other party. *See* TEX. R. CIV. P. 193.6(a); *Dyer*, 333 S.W.3d at 717. The party seeking to call the witness bears the burden of establishing good cause or the lack of unfair surprise or prejudice. *See* TEX. R. CIV. P. 193.6(b); *Dyer*, 333 S.W.3d at 717. The trial court has broad discretion to determine whether the party has met this burden, but the trial court's determination must be supported by the record. *See* TEX. R. CIV. P. 193.6(b); *Dyer*, 333 S.W.3d at 717; *see also Syrian Am. Oil Corp., S.A. v. Pecten Orient Co.*, 524 S.W.3d 350, 366 (Tex. App.—Houston [1st Dist.] 2017, no pet.). We review the trial court's decision to admit or exclude

26

evidence for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Rhey v. Redic*, 408 S.W.3d 440, 459 (Tex. App.—El Paso 2013, no pet.) (abuse-of-discretion standard applies to trial court's determination that party was not unfairly surprised or prejudiced by admission of untimely disclosed evidence).

## B.    Analysis

Santana does not dispute that his disclosures, filed in 2017, listed only himself and Ortiz as witnesses. When Ortiz's counsel objected to Santana calling another witness, the trial court heard arguments on the existence of good cause for failure to disclose witnesses and whether there was a lack of unfair surprise or prejudice to Ortiz. TEX. R. CIV. P. 193.6(b). Santana's counsel argued that discovery responses were submitted before he became the lead attorney on the case. Though his firm always represented Santana, he argued that he did not become the lead attorney until six weeks before trial in 2019. Ortiz's counsel responded that Santana's trial counsel's name appeared as an attorney of record on the original petition filed in 2017. She argued that Santana's original disclosures were filed nearly two years before trial without updating. She pointed out that the case had been pending for years, and Santana had not shown why he could not disclose the witnesses sooner. Ortiz's counsel argued that allowing additional witnesses would unfairly surprise and prejudice Ortiz because without more notice, she would be inadequately prepared for trial.

After hearing the parties' arguments, the court held that Santana failed to show good cause why he had not supplemented his disclosures. The court also held that if Santana was allowed to call additional witnesses, Ortiz would be unfairly surprised and unfairly prejudiced. At the end of trial, Santana made an offer of proof summarizing the testimony that several excluded witnesses would have provided.

On appeal, Santana argues that the trial court abused its discretion by excluding the witnesses. The record shows that Santana never updated his disclosures despite the litigation having spanned more than two years, and the record does not reflect good cause for failing to update them. Because the record shows that Santana did not meet his burden of establishing good cause for failure to timely disclose or establishing that Ortiz would not be unfairly prejudiced or surprised, we conclude that the trial court did not abuse its discretion by excluding the testimony of undisclosed witnesses. *See* TEX. R. CIV. P. 193.6(a–b); *In re J.P.B.*, 180 S.W.3d at 575. We overrule Santana's issue related to witness disclosure.

**Admission of Fact of Polygraph Examination**

In his second issue, Santana contends that the trial court erred in admitting evidence that Ortiz submitted to a polygraph examination. At trial, Santana objected when Cavazos, Ortiz's sister, mentioned that Ortiz had submitted to a polygraph examination. Santana objected based on hearsay. Ortiz responded that the results of a polygraph were inadmissible but the fact that Ortiz submitted to a polygraph test

28

was admissible. The court overruled Santana's objection. Cavazos then testified without objection that the results of the polygraph were submitted to the Houston Police Department. Even assuming that the admission of testimony about a polygraph was erroneous, the error does not require reversal.

## A. Standard of Review

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *In re J.P.B.*, 180 S.W.3d at 575. To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and the error (1) probably caused the rendition of an improper judgment or (2) probably prevented the appellant from properly presenting the case to the court of appeals. TEX. R. APP. P. 44.1. In determining if the admitted evidence probably resulted in the rendition of an improper judgment, we review the entire record, and "[t]ypically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Duran v. Smith*, No. 01–10–00018–CV, 2012 WL 1564537, at *7 (Tex. App.—Houston [1st Dist.] May 3, 2012, no pet.) (mem. op.) (quoting *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)).

**B.    Analysis**

In the criminal context, due to inherent unreliability and tendency to be unduly persuasive, the existence and results of polygraph examinations are inadmissible for any purpose on proper objection. *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990); *Martines v. State*, 371 S.W.3d 232, 250 (Tex. App.—Houston [1st Dist.] 2011, no pet.). But the mere mention of a polygraph examination does not automatically constitute reversible error, even if the results of the exam are revealed. *Tennard*, 802 S.W.2d at 683–84; *Martines*, 371 S.W.3d at 250. When polygraph results are mentioned but not revealed to the jury, an instruction to disregard is sufficient to cure any error. *Martines*, 371 S.W.3d at 251.

Here, the jury heard testimony over objection that Ortiz submitted to a polygraph examination. The jury also heard that Ortiz gave the results to the Houston Police Department, but Santana did not object to this testimony. Even assuming that the court abused its discretion in admitting testimony that Ortiz submitted to a polygraph examination was error, the error did not lead to a rendition of an improper judgment or prevent Santana from presenting his case to this court. TEX. R. APP. P. 44.1.

The record reflects that Santana became obsessed with Ortiz when she was a young girl. Santana obsessively and persistently communicated with Ortiz. He isolated her from her family and controlled her finances. Santana demanded sexual

30

photographs and favors from Ortiz on a regular basis. He forced her to have sex with him. Santana also threatened to harm or kill and cremate her and her children if she did not accede to his demands. Santana came and went from Ortiz's house as he pleased, often insisting that his children eat with him in the early hours of the morning.

The jury heard that Santana exposed young children to the crematory and retort and that he drove his children while dead bodies were in the car. The jury heard that Santana groped dead bodies, sent photographs of bodies during cremation to Ortiz, and traded sexual favors for funeral services. Multiple witnesses testified that Santana made them feel uncomfortable as young girls. The record also reflects that multiple witnesses commented that Santana's relationship with Becky appeared inappropriate. Many witnesses worried that the same thing could happen to S.A.S. The supervised visitation observer commented that Santana seemed to be alienating S.A.S. from her mother. In contrast, the record reflects that S.A.S. was well cared for while with Ortiz and that Ortiz sought to provide a stable, loving environment for S.A.S. under the circumstances.

Cavazos testified that Santana and Becky made repeated, unfounded allegations against Ortiz. Their relentless attacks forced Ortiz to never be alone, and she made sure to always have a witness to corroborate her whereabouts. As part of

this testimony, Cavazos testified that Ortiz had submitted to a polygraph exam after Becky alleged that Ortiz assaulted her.

In light of the entire record, the admission of the fact that Ortiz took a polygraph exam did not probably cause the rendition of an improper judgment or prevent Santana from properly presenting the case to this court. *See* TEX. R. APP. P. 44.1. The jury's decision did not turn on this evidence. *Duran*, 2012 WL 1564537, at *7. Accordingly, we hold that any error in the admission of the evidence did not constitute reversible error. We overrule Santana's second issue.

## Child Support Calculation

Santana contends that the trial court erred when it calculated child support. He argues that the child support amount was not supported by the evidence. We disagree.

## A.     Standard of Review

We review a trial court's judgment ordering child support under an abuse of discretion standard. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *Miles v. Peacock*, 229 S.W.3d 384, 388 (Tex. App.—Houston [1st Dist.] 2007, no pet.). "In the child-support context, sufficiency challenges are not independent points of error, but are incorporated into an abuse of discretion determination." *McGuire v. McGuire*, 4 S.W.3d 382, 387 n.2 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *see Newberry v. Bohn-Newberry*, 146 S.W.3d 233, 235

(Tex. App.—Houston [14th Dist.] 2004, no pet.). We employ a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *Moreno v. Perez*, 363 S.W.3d 725, 735 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support its order. *Newberry*, 146 S.W.3d at 235.

## B.    Analysis

Section 154.062 of the Texas Family Code requires a court to calculate "net resources" for the purpose of determining child support liability. TEX. FAM. CODE § 154.062(a). "Courts may calculate net resources on 'imprecise information,' and the trial court has broad discretion in setting child support." *Ayala v. Ayala*, 387 S.W.3d 721, 727 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Net resources" include all wage and salary income, self-employment income, and all other income received. TEX. FAM. CODE § 154.062(b). The obligor is required to furnish information sufficient to accurately identify his net resources and ability to pay child support. *Bello v. Bello*, No. 01-11-00594-CV, 2013 WL 4507876, at *3 (Tex. App.—Houston [1st Dist.] Aug. 22, 2013, no pet.) (mem. op.); *In re N.T.*, 335 S.W.3d 660, 666 (Tex. App.—El Paso 2011, no pet.); *see* TEX. FAM. CODE § 154.063. "'There must be some evidence of a substantive and probative character of net resources' in

33

order for the court to discharge its duty under section 154.062." *Miles*, 229 S.W.3d at 389 (quoting *Newberry*, 146 S.W.3d at 236); *Ayala*, 387 S.W.3d at 727.

The trial court is not required to accept the obligor's evidence of income and net resources as true. *In re N.T.*, 335 S.W.3d at 666. Instead, the trial court may properly determine that an obligor has higher net resources based on testimony by the obligee and other evidence in the record. *Id.* Moreover, a trial court may order the obligor to pay child support beyond the amount the obligor's income would ordinarily indicate if he could potentially earn more money but has chosen to remain underemployed or unemployed. *Id.* (citing TEX. FAM. CODE § 154.066); *see also Iliff v. Iliff*, 339 S.W.3d 74, 82–83 (Tex. 2011) (holding trial court has discretion to set child support award based on obligor's earning potential when obligee demonstrates intentional underemployment).

The trial court's judgment states that the parties agreed that Santana would pay maximum guideline support. The judgment also states that Santana's net resources per month were more than $8,550, "based on a preponderance of the evidence produced at the trial, including the fact that he ow[n]ed numerous real properties in and around Houston, Texas, [and] his funeral home business." The court ordered Santana to pay 20% of his net resources, or $1,710 per month, in child support and to provide medical and dental insurance for the child. Santana did not object when the trial court rendered judgment on child support.

Assuming that Santana preserved his argument related to child support obligations for appellate review and also assuming that the parties did not agree to maximum support, the trial court did not err in its child support findings. Santana did not provide documentary evidence of his income. Santana testified that he ran three funeral homes, including a crematory, and that he had the appropriate licenses to operate them. He also testified that he had several other business ventures. The record reflects that Santana had been the president of Santana Funeral Directors before 2017. The SAPCR suit was filed in 2017, and afterwards, Santana's mother became the president.

Santana testified that he provided financially for S.A.S. He testified that he paid the mortgage on the house where S.A.S. lived with Ortiz, maintenance for the house, yard maintenance, utilities, a new roof and floors, groceries, health insurance, and a vehicle. He also testified that in two years before suit, he spent in excess of $40,000 on vacations for the child.

On appeal, Santana states that he worked for his family business, receiving a "regular paycheck" that is less than the amount used to calculate his support obligation. But Santana did not provide proof the amount of his income at trial. "[W]e do not consider factual assertions that appear solely in briefs and are not supported by the record." *Marshall v. Hous. Auth.*, 198 S.W.3d 782, 789 (Tex. 2006). The record reflects that the trial court's determination of net resources was

supported by some evidence of a substantive and probative character. *Bello*, 2013 WL 507876, at *4; *N.T.*, 335 S.W.3d at 666–67 (holding that given appellant's failure to produce documents of his earnings, the trial court was within its discretion in basing its net resources determination on the conflicting testimony of the parties). Accordingly, the trial court did not abuse its discretion in its determination of the amount of child support. We overrule Santana's issue related to child support.

### Attorney's Fees

Santana contends that the trial court abused its discretion in awarding attorney's fees to Ortiz's attorney without submitting the question to the jury. He argues that Ortiz's failure to secure a jury verdict on attorney's fees amounts to a waiver of the claim. We disagree.

### A.    Standard of Review and Applicable Law

The Texas Family Code, within the context of a SAPCR suit, identifies those issues that a jury must decide, those a jury may decide, and those it may not decide. TEX. FAM. CODE § 105.002. Attorney's fees are found in none of these provisions. Section 106.002 of the Family Code provides the trial court with discretion to render judgment for reasonable attorney's fees and expenses to be paid directly to a party's attorney. *See* TEX. FAM. CODE § 106.002(a); *Tucker v. Thomas*, 419 S.W.3d 292, 296 (Tex. 2013). A judgment for attorney's fees under section 106.002 may be enforced by any means available for the enforcement of a judgment for debt. TEX. FAM. CODE

§ 106.002(b). An award of attorney's fees in this context is discretionary. *See In re O.G.M.*, 988 S.W.2d 473, 479 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd) (finding court did not abuse its discretion under section 106.002 in denying wife's request for attorney's fees). A party may waive its right to have the jury decide whether opposing counsel is entitled to attorney's fees. *McInnes v. Fife*, No. 14-00-00201-CV, 2001 WL 777078, at *1 (Tex. App.—Houston [14th Dist.] July 12, 2001) (mem. op.) (citing *Burlington Ins. Co. v. Mexican Am. Unity Council, Inc.*, 905 S.W.2d 359, 363 (Tex. App.—San Antonio 1995, no writ)). The trial court has broad discretion in deciding attorney's fees, and there is no abuse of discretion where an award of attorney's fees is supported by the evidence. *Guimaraes v. Brann*, 562 S.W.3d 521, 551 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating trial courts have broad discretion to award reasonable attorney's fees and expenses in SAPCRs); *London v. London*, 94 S.W.3d 139, 146 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The reasonableness of attorney's fees is a question of fact, and an appellate court may not substitute its judgment for that of the factfinder. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009).

## B.   Analysis

Before closing arguments, Ortiz's counsel informed the court that she needed to testify regarding attorney's fees. The court excused the jury while the court heard testimony on Ortiz's attorney's fees. Not only did Santana's counsel fail to object,

but he also participated in the hearing without objection. He cross-examined Ortiz's attorney as to the reasonableness of her attorney's fees. *See McInnes*, 2001 WL 777078 at \*2. We do not reach the merits of Santana's claim that he was entitled to a jury trial on attorney's fees because he failed to preserve the issue. When a party has perfected its right to a jury trial, but the trial court instead proceeds to trial without a jury, the party must either object on the record to the trial court's action or indicate affirmatively in the record that it intends to stand on its perfected right to a jury trial. *See Arredondo v. Betancourt*, 383 S.W.3d 730, 747 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The record does not reflect that Santana either affirmatively objected to the trial court's decision to decide attorney's fees or indicated that he intended to stand on his right to a jury trial. *See Id.* We overrule Santana's issue related to attorney's fees.

## Conclusion

We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Hightower.