

# NUMBER 13-24-00252-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MARC EDWIN BROOKS,**                                                       **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                       **Appellee.**

---

## ON APPEAL FROM THE CRIMINAL DISTRICT COURT NO. 1
## OF TARRANT COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Cron**
**Memorandum Opinion by Justice Silva**

Appellant Marc Edwin Brooks appeals his conviction of aggravated sexual assault

of a child, a first-degree felony.[1] *See* TEX. PENAL CODE ANN. § 22.021. Brooks was

---

[1] This case is before the Court on transfer from the Second Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. §§ 22.220(a)

sentenced to thirty-two years in the Texas Department of Criminal Justice Institutions Division. By two issues, Brooks argues the trial court abused its discretion by (1) "overruling [his] motion to quash the indictment for failing to provide sufficient notice" and (2) "den[ying] [his] motion for mistrial based on the [S]tate['s] witness injecting polygraph evidence." We affirm.

## I.   BACKGROUND

### A.   Procedural History

Brooks was indicted for aggravated sexual assault of a child on May 18, 2022. *See id*. The indictment alleged that on or about August 20, 1992, Brooks "intentionally or knowingly, by any means, cause[d] the penetration of the female sexual organ of [Jane[2]], and [Jane] was younger than 14 years of age and she was not the spouse of the defendant at the time of the offense." On March 27, 2024, Brooks filed a motion to quash the indictment, arguing (1) that the indictment "fail[ed] to allege specifically by which manner and means the offense was committed" and (2) that "the statutory element of 'by any means' is constitutionally overly vague and does not put the defendant on notice as to what body part and/or item was used to penetrate or how penetration was perpetrated." On April 2, 2024, the day of trial, a pretrial hearing was held and Brooks requested that the indictment be quashed. The trial court denied the motion to quash, and a jury was subsequently impaneled.

---

(delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

   [2] To protect the identity of the complainant, who was a child at the time the crimes occurred, we refer to her by a pseudonym. *See* TEX. R. APP. P. 9.8 cmt.

**B.      Jury Trial**

Tarrant County Sherrif's Office (TCSO) Corporal Homero Canero testified that he has been a qualified peace officer with TCSO for over ten years and is currently "assigned to error resolution." Corporal Canero testified that "in error resolution, we maintain accuracy of the crime records, which includes any record consolidations via fingerprint analysis, . . . arrest information, [and] errors." Corporal Canero further stated that he is qualified to analyze fingerprint records. Corporal Canero verified Brooks's previous felony case based on information about his fingerprints and unique identifying information such as the defendant's name, the victim's name, fingerprints, and his county identification number. The records in Brooks's previous case indicated that he was indicted and pleaded guilty to aggravated sexual assault of Jane on April 30, 1991.

Jane testified that she has seven siblings and that she moved to Fort Worth, Texas when she was approximately three years old. Jane's mother married Brooks on August 30, 1985, which was around the time he entered Jane's life. Jane recalled that Brooks started sexually abusing her around that time and that the sexual abuse occurred "on a weekly basis" and that "he would force me to look at his penis, stroke it, put my mouth around it." Jane further stated that Brooks "would put his penis in [her] vagina and [her] anus. He would tell me to urinate on him." Jane recalled feeling "physical pain" and that Brooks's sexual abuse would "hurt so much." Jane said that she first made an outcry of sexual abuse when she was six years old. Jane's mother called the Texas Department of Family and Protective Services (CPS), and CPS conducted an investigation. Jane spoke with CPS caseworker Melanie Cleveland. During the investigation, Jane's mother and Brooks, along with the children, including Jane, fled to Missouri. Thereafter, CPS removed

3

Jane and her seven siblings from their home in Missouri. Following these events, Brooks was placed on unadjudicated community supervision for aggravated sexual assault of a child on April 30, 1991. Subsequently, Jane, her mother, and her siblings moved back to Fort Worth, Texas, and during Brooks's community supervision, he gradually moved back to the family home with them.

Jane testified that there was a period of time when Brooks did not sexually abuse her. However, she claimed that changed in the summer of 1992 when she "woke up to [Brooks] fondling [her] genitals under [her] underwear." According to Jane, "[Brooks] penetrated [her] with his fingers." She was ten years old at the time. Jane never reported the subsequent sexual abuse because "[she] didn't want to be taken away again," "didn't want to separate the family, [or] cause more pain for [her] siblings."[3] When Jane was in high school, "[Brooks] would touch [her] breasts and buttocks." Jane testified that, in August of 2019, she was attending a wedding when she observed one of her nephews handing out wedding brochures with Brooks. Jane was "shocked and . . . very concerned and disturbed." She explained that her shock was due to her siblings permitting Brooks to be around their children. Because of this, Jane ultimately decided to report that she was sexually abused by Brooks in the summer of 1992.

Fort Worth Police Department (FWPD) Detective Walter Scott Byington testified that he was employed with FWPD for forty-two years. During his career, Detective

---

[3] Samantha Torrance testified that she is a "forensic interviewer supervisor at Alliance [f]or Children," which is "the Children's Advocacy Center of Tarrant County." Torrance further testified that she supervises "five forensic interviewers." Torrance explained that child coaching and child grooming involves placing a child in fear of being separated from their family if the child speaks about their abuse. She further explained that the disclosure of sexual abuse is a process and "not a one-time event." Torrance additionally testified that "being removed from the home . . . is one of the big reasons why kids will recant . . . and that the "fear of [the] removal process . . . can also be one of the barriers to talking about abuse within a home."

4

Byington was briefly assigned to the Sexual Assault Unit (SAU). Detective Byington testified that he was assigned to Brooks's case around July of 1989. He also testified that Cleveland initiated the sexual assault report with FWPD. By the time Detective Byington was assigned to Brooks's case, Cleveland had already conducted a video interview with Jane. Detective Byington viewed the interview and based on his findings, "[he] felt [he] had enough probable cause . . . [and] got a warrant then." Detective Byington further testified that the warrant was signed on July 11, 1989. On July 25, 1989, Brooks gave a voluntary confession to Detective Byington:

> I admit to the allegations of sexual assault to my daughter, [Jane]. The incidents began as far back as I can remember last October 1988 and continued on until July 1989. I admit to having touched [Jane]'s vagina and butt with my hands and oral sex with her. I had put my penis in her mouth and my mouth on her vagina. I never attempted sexual intercourse or anal intercourse with her. The last occurrence I can recall was the last week of June 1989. That's when I had performed oral sex with [Jane]. The next day I was confronted by my wife, [Jane's mother], about the incidents with [Jane]. [Jane's mother] told me she had contacted [CPS] and spoke with the counselor, Melanie Cleveland.

Detective Byington further testified that "it was real obvious to me that [Brooks] was leaving out important stuff" in his confession.

Cleveland testified that she worked for CPS for three years as a caseworker and she eventually "became a special investigator for the [SAU] in Tarrant County." Cleveland explained that the SAU investigated, among other areas, "infants all the way to [seventeen] years old that had been alleged to have been sexually molested." Cleveland recalled the details of Brooks's case and stated that it was unusual that Jane's mother "was the one that initiated the investigation of her child." During Cleveland's investigation, she discovered that Brooks was still living in the family home with Jane. In 1989,

5

Cleveland conducted an interview with Jane and subsequently interviewed Brooks the following day. Cleveland recalled Brooks telling her that "he tried to see . . . how long he could go without touching [Jane] . . . but that he couldn't help it." Additionally, Brooks told Cleveland that "he was not [remorseful] but that he knew that it had gotten out of hand."

Cleveland explained that a family plan of service was initiated to "help [the] family stay together" and Jane was eventually returned to her mother. However, Brooks and Jane's mother did not follow the CPS agreement, and the couple fled to Missouri with Jane and her siblings. Eventually, the children were removed from their home in Missouri and placed in foster care. Cleveland testified that the next time she interacted with Jane's family was in the summer of 1994. Cleveland received a phone call from Brooks's sex offender therapist, which ultimately led to the second removal of Jane and her siblings by CPS.

Debra Ann McSherry testified that she "used to be a therapist with Mike Strain [and] Associates and worked with [Brooks]." McSherry started working for Strain in July of 1991. McSherry testified that she was a therapist who worked with sex offender groups "on all the different goals [of] their treatment plan." She further testified that each sex offender has an individualized treatment plan and the treatment plan "is based on results of testing they did with written testing, plethysmograph, and for some people, polygraph." McSherry further stated that she has worked with hundreds of sex offenders and that the majority of her clients are on probation or parole. The following colloquy occurred during McSherry's testimony:

[State]:               Okay. Did you sometimes have to do intake?

[McSherry]:           Yes, I did do some intakes. [Strain] did a lot of

6

the intakes, but I did do some intakes there.

[State]: Okay. Each person that goes through [Strain]'s office, are they given an individualized treatment plan?

[McSherry]: Yes. And it is based on results of testing they did with written testing, plethysmograph, and for some people, polygraph, so–and–and the nature of their offense and whether they denied their offense.

. . . .

[State]: I want to talk about this process of counseling and what a new client would walk through, essentially. And when you get a new client, I guess walk us through what they have to do in terms of testing.

[McSherry]: So they would do an intake interview, many times with [Strain], sometimes with me, sometimes other people, but primarily him, sets them up for written testing, sets them up for a penile plethysmograph. And for some offenders, depending on their level of denial, not everyone, because we're expecting that when they first come into treatment, that they deny elements or–they may have to take a polygraph.

[Brooks's counsel]: Objection. This is a violation of the motion in limine.

[State]: This is not–there is no–may we approach?

THE COURT: Yes.

(Discussion on the record at the bench outside the [presence] of the jury.)

[Brooks's counsel]: The State's own motion in limine is—that's limined out to mention polygraphs or the penile plethysmographs.

[State]: This is not the results of one taken. This is just–

7

| | |
|---|---|
| [Brooks's counsel]: | But now the jury knows he's taken a polygraph. |
| THE COURT: | All right. I'm not going to let her talk about polygraphs. |
| [Brooks's counsel]: | All right. |
| THE COURT: | So just don't say polygraph. |
| [State]: | Okay. |
| [Brooks's counsel]: | Judge, we move now to declare a mistrial. |
| THE COURT: | That's denied. |
| [Brooks's counsel]: (Open court.) | Judge, I also ask you to strike the testimony and ask the jury to disregard. |
| THE COURT: | Strike the last answer. And the Jury is instructed to disregard the last answer. |

McSherry further explained that over the course of treating Brooks, he was not compliant with various sex offender treatment modules, and he missed twenty-six "group sessions through the years that he was there."

The jury found Brooks guilty of aggravated sexual assault of a child and sentenced him to thirty-two years' confinement. This appeal followed.

## II.    MOTION TO QUASH

By his first issue, Brooks complains that the trial court abused its discretion in denying his motion to quash the indictment because Brooks did not receive sufficient notice. In his argument, Brooks advances two main points: (1) the "statutory element of 'by any means' was constitutionally overly vague"; and (2) that the "vagueness of [the]

8

charge exposed him to a [d]ouble [j]eopardy violation."[4]

## A.    Standard of Review and Applicable Law

A criminal defendant has the constitutional right to fair notice of the specified offense against him. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CONST. art. V, § 12b; *State v. Barbernell*, 257 S.W.3d 248, 250 (Tex. Crim. App. 2008) ("The Texas and United States Constitutions grant a criminal defendant the right to fair notice of the specific charged offense."); *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. 2003) ("[A] defendant does have a constitutional right to sufficient notice so as to enable him to prepare a defense."). Consequently, charging instruments "must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *see also* TEX. CODE CRIM. PROC. ANN. arts. 21.02–.04, .11 (setting forth the statutory requirements for indictments).

Notice must come from the face of the indictment, *see Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000), and generally, an indictment that tracks the statutory text of an offense is sufficient to provide a defendant with adequate notice. *See State v. Zuniga*, 512 S.W.3d 902, 907 (Tex. Crim. App. 2017). If the charging language of an indictment specifies "all the manner and means upon which the State is permitted to rely, there is no notice problem." *Williams v. State*, 685 S.W.3d 110, 115 (Tex. Crim. App. 2024). But in some cases, an indictment that tracks the statutory language may be

---

[4] Brooks also asserts that the phrase "by any means" did not provide notice as to "who caused the penetration." Regarding this contention, the State argues that Brooks failed to preserve this issue. We conclude that Brooks's argument is waived because it does not comport with the complaints made in his written motion to quash. *See* TEX. R. APP. P. 33.1; *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).

insufficient to provide a defendant with adequate notice. *Id*.; *Borders v. State*, 654 S.W.3d 202, 205 (Tex. App.—Austin 2022, no pet.) ("Similarly, an indictment tracking the statutory language may be insufficient when a defendant needs additional information to be able to 'investigate the allegations against him and establish a defense.'" (citations omitted)).

A challenge to the sufficiency of a charging instrument raises a question of law. *Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010). Accordingly, appellate courts review a trial court's ruling on a motion to quash an indictment de novo. *Id*. at 13–14; *State v. Zuniga*, 583 S.W.3d 209, 214 (Tex. App.—Corpus Christi–Edinburg 2018, pet. ref'd). "The trial court's ruling should be upheld if it is correct under any theory of law applicable to the case." *Zuniga*, 512 S.W.3d at 906.

Sufficient notice "may be satisfied by means other than the language in the charging instrument". *Kellar*, 108 S.W.3d at 313. "In analyzing whether a charging instrument provides adequate notice, our notice jurisprudence makes clear that courts must engage in a two-step analysis." *Barbernell*, 257 S.W.3d at 255. We (1) identify the elements of the offense, and (2) determine "whether the statutory language is sufficiently descriptive of the charged offense." *Zuniga*, 512 S.W.3d at 907. Finally, "[w]hen a motion to quash is overruled, a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend." *Kellar*, 108 S.W.3d at 313.

## B.    Analysis

Brooks argues that the phrase "by any means" is unconstitutionally vague and does not provide him with sufficient notice to defend the allegations against him.

10

**1. Statutory Language and Sufficient Notice**

When considering the constitutionality of a statute, "we begin with the presumption that the legislature has not acted unconstitutionally." *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). As further noted by the Texas Court of Criminal Appeals:

> A statute is void for vagueness if it fails to define the criminal offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not permit arbitrary and discriminatory enforcement. If . . . a statute does not substantially implicate constitutionally protected conduct or speech, it is valid unless it is impermissibly vague in all applications or as applied to the defendant.

*Id.* (internal quotation marks and footnotes omitted) (quoting *State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006)). Under the Texas Penal Code that was in effect in 1992, a person commits the offense of aggravated sexual assault of a child if the person "intentionally or knowingly causes the penetration of the anus or female sexual organ of a child by any means." *See* TEX. PENAL CODE ANN. § 22.021.

The indictment in the present case alleged that on or about August 20, 1992, Brooks "intentionally or knowingly, by any means, cause[d] the penetration of the female sexual organ of [Jane], and [Jane] was younger than 14 years of age and she was not the spouse of the defendant at the time of the offense." Brooks's indictment in this case directly tracks the statutory language of the Texas Penal Code that was in effect in 1992. We must then consider whether the allegations are such that "ordinary people can understand what conduct is prohibited and in a manner that does not permit arbitrary and discriminatory enforcement." *Lawrence*, 240 S.W.3d at 915. Specifically, the plain language of the statute in the present case prohibits any means of penetrating a child's sexual organ. We conclude that no ordinary person reading the statute would have any

11

doubt as to what type of conduct is prohibited by law. Based on the foregoing, we find that the statute is not impermissibly and overly vague.

Further, Texas Court of Criminal Appeals notes that if the charging language of an indictment specifies "all the manner and means upon which the State is permitted to rely, there is no notice problem." *Williams*, 685 S.W.3d at 115. Here, the charging instrument did not specify one particular manner or means of conduct, but rather "by any means." Based on *Williams*, we find that a notice problem does not exist in the current case because the State alleged "by any means." *See id*. Therefore, having found that the statutory language as noted above is not unconstitutionally vague, we consequently find that the indictment provided sufficient notice to Brooks such that he could prepare a defense. *See Moff*, 154 S.W.3d at 601.

Even assuming that Brooks's indictment did not provide adequate notice, he was provided sufficient notice by means other than the charging instrument. *See Kellar*, 108 S.W.3d at 313. During Brooks's motion to quash hearing, the State noted that "the specific manner of how the victim's female sexual organ was penetrated has been provided to the defense in discovery." Thereafter, the State admitted into evidence, for record purposes, Jane's interview with FWPD and a copy of the FWPD offense report. We conclude that, even if the charging instrument provided inadequate notice, Brooks did not suffer harm because he received actual and sufficient notice of the State's theory through the previously mentioned evidence admitted by the State. *See id.* The record shows that Brooks had actual notice of the specific means of the conduct upon which the State based its allegations.

12

**2.  Double Jeopardy**

The United States Constitution provides that no person may be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. "The Fifth Amendment offers three different constitutional protections. First, protection against a second prosecution for the same offense after acquittal. Second, protection against a second prosecution for the same offense after conviction. Third, protection against multiple punishments for the same offense." *Bigon v. State*, 252 S.W.3d 360, 369–70 (Tex. Crim. App. 2008).

Brooks argues that the vagueness of the indictment "exposed him to a [d]ouble [j]eopardy violation." We disagree. This case involves the third protection category recognized by the Fifth Amendment. *See id.* The proper avenue for a double jeopardy claim is after Brooks has been charged or indicted for an unnamed future offense. *See Burks v. State*, 876 S.W.2d 877, 889 (Tex. Crim. App. 1994) (en banc) (holding that for "any potential claim of jeopardy which appellant might have to assert in a future prosecution, the proper time to argue this issue is after he has been charged or indicted for that unnamed future offense"). Here, there is no indication from the record that the State initiated a subsequent prosecution under the same circumstances as the present case. *See id.*

Based on the foregoing, we conclude that the trial court did not err in denying his motion to quash. Brooks's first issue is overruled.

### III.  DENIAL OF MISTRIAL

By his second issue, Brooks challenges the trial court's denial of his request for a mistrial urged after the State's witness testified that a polygraph and penile

13

plethysmograph are components of sex offender treatment.

## A.      Standard of Review and Applicable Law

A trial court's denial of a mistrial is reviewed for an abuse of discretion, and we must uphold a trial court's ruling if it is within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010); *Stahmann v. State*, 548 S.W.3d 46, 68 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567(Tex. Crim. App. 1999)). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ladd*, 3 S.W.3d at 567. The question of whether a mistrial should have been granted involves a similar analysis as a harm analysis. *Hawkins*, 135 S.W.3d at 77. In determining whether a trial court abused its discretion, we review: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Id.*; *see Cook v. State*, No. 13-19-00610-CR, 2021 WL 317645, *3 (Tex. App.—Corpus Christi–Edinburg January 28, 2021, no pet.) (mem op., not designated for publication).

"Due to their inherent unreliability and tendency to be unduly persuasive, the existence and results of polygraph examinations are inadmissible for any purpose in a criminal proceeding on proper objection." *Martines v. State*, 371 S.W.3d 232, 250 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990)). "The mere mention of a polygraph examination does not, however, automatically constitute reversible error, even if the results of the exam are

revealed." *Martines*, 371 S.W.3d at 250. (first citing *Tennard*, 802 S.W.2d at 683–84; then citing *Jasso v. State*, 112 S.W.3d 805, 813 (Tex. App.—Houston [14th] 2003, pet. ref'd)). "When a polygraph is mentioned at trial and defense counsel requests a mistrial, we must first determine whether the results were revealed to the jury." *Id*. at 250–51 (first citing *Tennard*, 802 S.W.2d at 683; then citing *Jasso*, 112 S.W.3d at 814). "Generally, when polygraph results are mentioned but not revealed to the jury, an instruction to disregard is sufficient to cure any error. *Id.* at 251 (citing *Jasso*, 112 S.W.3d at 814). "In determining whether the trial court erroneously refused to grant a mistrial, we may also consider (1) whether the questioning party exhibited bad faith by asking a question designed to elicit polygraph evidence; and (2) whether polygraph evidence bolstered the State's case." *Id*. (first citing *Jasso*, 112 S.W.3d at 814, then citing *Buckley v. State*, 46 S.W.3d 333, 337 (Tex. App.—Texarkana 2001, pet. dism'd)).

**B.    Analysis**

Before turning to the merits of Brooks's second issue, we first address whether he preserved error. "Because preservation of error is a systemic requirement on appeal, a court of appeals should review preservation of error regardless of whether the issue was raised by the parties." *Bekendam v. State*, 441 S.W.3d 295, 299 (Tex. Crim. App. 2014). To preserve error, an objection must be timely made with sufficient specificity to apprise the trial court of the complaint and basis for the objection, and the party making the objection must obtain a ruling on that objection. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Null v. State*, 690 S.W.3d 305, 318 (Tex. Crim. App. 2024). "The purpose for requiring a timely, specific objection is twofold: (1) it informs the judge of the basis of the objection and affords him an opportunity to rule on it[;] and (2) it affords opposing counsel an opportunity

15

to respond to the complaint." *Null*, 690 S.W.3d at 318 (quoting *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021). In a jury trial, the timing of an objection and a ruling is important because if the objection is not made early enough and a ruling is not obtained, the jury might hear evidence that it might never have heard at all. *Garza v. State*, 126 S.W.3d 79, 83–84 (Tex. Crim. App. 2004). "In most instances, an objection will prevent the occurrence of the prejudicial event, and the failure to make a timely, specific objection prevents appellate review." *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004).

In the present case, the State asked McSherry about the initial intake interview process for clients participating in sex offender treatment. McSherry testified, among other things, that each of her clients had an individualized treatment plan "based on results of testing they did with written testing, plethysmograph, and for some people, polygraph." Brooks's trial counsel did not object to McSherry's first mention of the words polygraph or plethysmograph. Thereafter, McSherry testified again about the possibility of a polygraph being a part of sex offender treatment. McSherry's second mention of the polygraph involved the same subject matter as her previous statement. McSherry testified that "for some offenders, depending on their level of denial, . . . they may have to take a polygraph."

Brooks objected to McSherry's second mention of the polygraph test, which was granted by the trial court. At this point, however, the jury had already heard this exact testimony. Stated differently, the jury was already informed that polygraph testing may be a component of sex offender treatment by the time Brooks's counsel lodged an objection. Therefore, we find that his objection was untimely and not made at the earliest possible

16

opportunity to inform the trial court of the basis for the objection. *See* TEX. R. APP. P. 33.1(a)(1)(A); s*ee also Null*, 690 S.W.3d at 318. Brooks's failure to make a timely, specific objection to the polygraph testimony prevents our appellate review on his second issue. *See Young*, 137 S.W.3d at 70; *see also Green v. State*, 713 S.W.3d 865, 885 (Tex. Crim. App. 2025) (reasoning that objecting to testimony or moving for mistrial "is untimely if it is raised after the question has been asked and answered").

Even assuming Brooks preserved his complaint for our review, we disagree that the trial court abused its discretion in denying his motion for mistrial. We first assess the severity of the misconduct. *Hawkins*, 135 S.W.3d at 77. In *Hawkins*, the Texas Court of Criminal Appeals noted that "we continue[] to equate 'severity of the misconduct' with its prejudicial effect. . . . [P]articularly offensive or outrageous conduct generally gives rise to a natural inference of prejudice and can be considered as such, even when prejudice is not otherwise apparent from the record." *Id*. at 77–78. Under Texas law, when a witness gives a nonresponsive answer that mentions a polygraph test, we initially inquire into whether the results of the test were revealed. *Martines*, 371 S.W.3d at 250–51. Here, McSherry did not disclose the contents of a specific polygraph test administered to Brooks nor mention if he was given a polygraph test.

Further, even when polygraph test results are not disclosed, we look to "(1) whether the question exhibited bad faith by being designed to elicit that a polygraph was taken or what the results of that polygraph were; and (2) whether the effect of the evidence is to impeach the defendant's defensive theory or to bolster the State's case." *Id.* at 250. Here, the State told McSherry to "walk us through what [a sex offender] ha[s] to do in terms of testing." This statement was simply directing McSherry to explain the

intake process of sex offender treatment to the jury. Therefore, the record does not reflect that the State made any attempt to specifically elicit a response from McSherry about a polygraph test nor were any polygraph testing results revealed to the jury as a result of the questioning. *See id.* Additionally, the record does not reflect that the State was attempting to bolster its case. *See id*. Because of the foregoing reasoning, we do not consider this conduct severe. We conclude that McSherry's comments were not highly prejudicial because the record reflects that there was no mention that polygraph results were disclosed nor was there mention that Brooks took a polygraph test.

Next, we investigate any measures the trial court adopted to cure the misconduct. *See Hawkins*, 135 S.W.3d at 77. Brooks's trial counsel lodged an objection upon McSherry's second mention of a polygraph. In turn, the trial court sustained the objection, struck the testimony from the record, and instructed the jury to disregard the testimony. In viewing the record, we conclude that the trial court's instruction to the jury to disregard McSherry's statements was sufficient to cure any error arising from a polygraph reference. *See Martines*, 371 S.W.3d. at 252 (holding that "the trial court's instruction to the jury to disregard [an investigator's] question to appellant sufficiently cured any error arising from the reference to a polygraph examination").

Finally, we review the certainty of the conviction absent the misconduct. *See Hawkins*, 135 S.W.3d at 77. Texas Code of Criminal Procedure provides that the uncorroborated testimony of a sexual assault victim who is seventeen years of age or younger is sufficient to uphold a conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a)(b)(1). In a jury trial, "[t]he jury acts as the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented."

18

*Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023). We find that there is substantial and compelling evidence to support Brooks's conviction. Here, Jane testified that she turned ten years old on August 20, 1992. Jane further testified that in the summer of 1992, Brooks touched her vagina and "penetrated [her] with his fingers." Multiple witnesses testified and made it apparent that Brooks was previously placed on community supervision for sexually assaulting Jane. As expressly provided by the Texas Code of Criminal Procedure, Jane's uncorroborated testimony is sufficient for a jury to convict Brooks of the offense of aggravated sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a)(b)(1). After our review of the entire record, we conclude that a jury would have convicted Brooks regardless of McSherry's general comments regarding the fact that polygraph testing is a component of sex offender treatment.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Brooks's motion for a mistrial. *See Coble*, 330 S.W.3d at 292; *see also Garcia v. State*, 907 S.W.2d 635, 639 (Tex. App.—Corpus Christi–Edinburg 1995), *aff'd*, 981 S.W.2d 683 (Tex. Crim. App. 1998) (finding no error when "there was no testimony that appellant actually took a polygraph test" and no "results of the test were revealed to the jury."). Brooks's second issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
11th day of December, 2025.

19